60 P.3d 798

Margot C. TORRES, Plaintiff–Appellee,

v.

Alfred TORRES, Jr., Defendant,

and

Louan Torres, Successor–In–Interest/
Party–In–Interest–Appellant.

No. 23089.

Supreme Court of Hawai'i.

Dec. 17, 2002.

As Amended Jan. 6, 2003.

Michael F. McCarthy, Honolulu, on the briefs, for survivor-in-interest/party-in-interest-appellant, Louan Torres.

Blake T. Okimoto, Honolulu, on the briefs, for plaintiff-appellee, Margot C. Torres.

Ashley K. Ikeda Honolulu, and Lori K. Aquino (of Van Bourg, Weinberg, Roger & Rosenfeld), on the briefs, for amicus curiae Board of Trustees of the Pension Trust for Operating Engineers.

MOON, C.J., LEVINSON, and NAKAYAMA, JJ.; ACOBA, J., dissenting, with whom RAMIL, J., joins.

Opinion of the Court by MOON, C.J.

Successor-in-interest/party-in-interest-appellant Louan B. Torres (Louan), the surviving spouse of Alfred Torres, Jr. (Alfred), appeals from the Family Court of the First Circuit's: (1) November 17, 1999 order granting the motion of plaintiff-appellee Margot C. Torres (Margot), Alfred's ex-spouse, for entry of an amended "qualified domestic relations order"; and (2) December 17, 1999 order denying Louan's motion for reconsideration of the grant of Margot's motion. The family court's orders effectively amended Margot and Alfred's 1989 divorce decree [hereinafter, Decree or initial Decree] after Alfred's death and awarded survivorship benefits from Alfred's pension to Margot. On appeal, Louan contends that the family court erred because: (1) neither Louan nor Alfred's estate were parties to the instant action, which was brought by Margot; (2) the language of the Decree and Hawai'i Revised Statutes (HRS) § 580–56 (1993) did not permit the family court to exercise jurisdiction over the rights to survivor benefits associated with Alfred's pension; (3) the court's finding concerning the date that Margot received notice from Alfred's pension fund that she was not entitled to retirement benefits based on the Decree as it was then written was clearly erroneous; (4) the court's orders interfered with Louan's rights to pension benefits insofar as, under the Employee Retirement Income Security Act of 1974 (ERISA), Pub.L. No. 93–406, 88 Stat. 832, as amended by the Retirement Equity Act of 1984(REA), Pub.L. No. 98–397, 98 Stat. 1426 (codified at 29 U.S.C. § 1001 et. seq.), such rights vested in Louan at either Alfred's retirement or death; and (5) the court's orders further interfered with Louan's rights to certain "segregated amounts" of the pension benefits pursuant to ERISA, as amended by the REA. Margot disagrees and also contends that this court does not have jurisdiction over Louan's appeal because the appeal is untimely. Finally, amicus curia The Board of Trustees of the Pension Trust Fund for Operating Engineers (the Fund), the trustees of Alfred's pension, submits that the family court's orders do not violate federal law.

For the reasons discussed herein, we affirm the family court's orders.

## I. *INTRODUCTION*

Because this case involves aspects of pension benefits that are governed by federal law, a preliminary review of some aspects of this law may facilitate an understanding of the background facts. ERISA, as amended by the REA [hereinafter, collectively, ERISA, unless it is clear from the context that pre-REA aspects of ERISA are discussed], is designed to ensure the proper administration of employee benefit and pension plans. *See Boggs v. Boggs,* 520 U.S. 833, 839, 117 S.Ct. 1754, 138 L.Ed.2d 45, *reh'g denied,* 521 U.S. 1138, 118 S.Ct. 9, 138 L.Ed.2d 1043 (1997). In initially enacting ERISA, Congress explained that:

> [T]he growth in size, scope, and numbers of employee benefit plans in recent years has been rapid and substantial; .... the continued well-being and security of millions of employees and their dependents are directly affected by these plans; ... they are affected with a national public interest; ... [and] they have become an important factor affecting the stability of employment and the successful development of industrial relations ....

29 U.S.C. § 1001(a).[1] ERISA is an intricate and comprehensive regulatory scheme. *See Boggs,* 520 U.S. at 841, 117 S.Ct. 1754. All employee benefit plans must conform to various reporting, disclosure, and fiduciary requirements, *see generally* 29 U.S.C. §§ 1021, 1031, and 1101 to 1114. In addition to the foregoing requirements, pension plans must also comply with various participation, vesting, and funding requirements. *See generally* 29 U.S.C §§ 1051 to 1086; *Boggs,* 520 U.S. at 841, 117 S.Ct. 1754.

The principal object of ERISA is to protect

> the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

29 U.S.C. § 1001(b); *see also Boggs,* 520 U.S. at 845, 117 S.Ct. 1754. ERISA imposes a general duty upon plan fiduciaries to act "solely in the interest of the participants and beneficiaries ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries ...." 29 U.S.C. § 1104(a)(1)(A)(i).

A typical form of retirement benefit is a "qualified joint and survivor annuity" (QJ & SA) that, under ERISA, each pension plan is required to offer to its participants. *See* 29 U.S.C. § 1055(a)(1).[2] A QJ & SA guarantees payment of a stipulated amount to two persons—typically the retired participant and his or her spouse—while both are alive. *See* 29 U.S.C. § 1055(d);[3] *see also Dorn v. International Brotherhood of Electrical Workers,* 211 F.3d 938, 941 (5th Cir.2000). If the participant dies first, the surviving spouse is

---

**1.** Unless expressly indicated, all references to Title 29 of the United States Code are to the 2000 edition, which contains language identical to the statutory provisions in place at the time of the family court proceedings. There have been no significant substantive changes in the law pertinent to this case since that time.

**2.** 29 U.S.C. § 1055(a) states:
> Each pension plan to which this section applies shall provide that—
> (1) in the case of a vested participant who does not die before the annuity starting date, the accrued benefit payable to such participant shall be provided in the form of a qualified joint and survivor annuity, and
> (2) in the case of a vested participant who dies before the annuity starting date and who

has a surviving spouse, a qualified preretirement survivor annuity shall be provided to the surviving spouse of such participant.

**3.** 29 U.S.C. § 1055(d) provides, in relevant part:
> For purposes of this section, the term "qualified joint and survivor annuity" means an annuity—
> (1) for the life of the participant with a survivor annuity for the life of the spouse which is not less than 50 percent of (and is not greater than 100 percent of) the amount of the annuity which is payable during the joint lives of the participant and the spouse, and
> (2) which is the actuarial equivalent of a single annuity for the life of the participant.

guaranteed, for the remainder of his or her life, payments equal to at least fifty percent of the amount received while the participant was alive. 29 U.S.C. § 1055(d). Should the participant die after working long enough to qualify for benefits but before retiring, the surviving spouse is also guaranteed lifetime payments; this benefit is referred to as a qualified preretirement survivor annuity (QPRSA). *See* 29 U.S.C. §§ 1055(a)(2) and 1055(e).[4] Both forms of benefits—the QJ & SA and the QPRSA—are referred to collectively throughout this memorandum as "surviving spouse benefits" or "survivor benefits."

To accomplish its ends, ERISA contains a broad anti-alienation, or "spendthrift" provision, 29 U.S.C. § 1056(d)(1), (discussed *infra*), that prohibits pension plans from assigning benefits to individuals other than the designated participant or current surviving spouse. Moreover, ERISA also contains a broad preemption provision that supersedes contradictory state laws, 29 U.S.C. § 1144(a) (discussed *infra*), including, in some respects, domestic relations law. Prior to the enactment of the REA, courts apparently disagreed as to whether this preemption provision, in combination with the spendthrift provision, barred state courts from issuing orders in domestic relations proceedings that

could affect pension benefits governed by ERISA. *See Trustees of the Directors Guild of America–Producer Pension Benefits Plans v. Tise*, 234 F.3d 415, 419 (9th Cir. 2000) [hereinafter, *Directors Guild* ]. As a result, a participant's ex-spouse was at risk, in some circumstances, of being "frozen out" of any retirement benefits earned by the participant attributable to employment that took place during the course of the marriage. If the participant remarried and subsequently died, the surviving spouse—rather than the ex-spouse—may have been entitled to the benefits payable under either a QJ & SA or a QPRSA, regardless of the equities of the situation. *See* 29 U.S.C. §§ 1055(d) and 1055(e).

> Responding to the confusion on this point, and "taking into account changes in work patterns, the status of marriage as an economic partnership, and the substantial contribution to that partnership of spouses who work both in and outside the home," Congress amended ERISA in 1984 [by passing the REA] specifically to provide for state-court-ordered assignments of plan benefits to former spouses and dependents.

*Directors Guild*, 234 F.3d at 419 (quoting Senate Judiciary Committee, S.Rep. No. 98–

---

**4.** 29 U.S.C. § 1055(e) states, in relevant part:

> For purposes of this section—
> (1) Except as provided in paragraph (2), the term "qualified preretirement survivor annuity" means a survivor annuity for the life of the surviving spouse of the participant if—
> (A) the payments to the surviving spouse under such annuity are not less than the amounts which would be payable as a survivor annuity under the qualified joint and survivor annuity under the plan (or the actuarial equivalent thereof) if—
> (i) in the case of a participant who dies after the date on which the participant attained the earliest retirement age, such participant had retired with an immediate qualified joint and survivor annuity on the day before the participant's date of death, or
> (ii) in the case of a participant who dies on or before the date on which the participant would have attained the earliest retirement age, such participant had—
> (I) separated from service on the date of death,
> (II) survived to the earliest retirement age,

> (III) retired with an immediate qualified joint and survivor annuity at the earliest retirement age, and
> (IV) died on the day after the day on which such participant would have attained the earliest retirement age, and
> (B) under the plan, the earliest period for which the surviving spouse may receive a payment under such annuity is not later than the month in which the participant would have attained the earliest retirement age under the plan.
> In the case of an individual who separated from service before the date of such individual's death, subparagraph (A)(ii)(I) shall not apply.
> (2) In the case of any individual account plan or participant described in subparagraph (B) or (C) of subsection (b)(1) of this section, the term "qualified preretirement survivor annuity" means an annuity for the life of the surviving spouse the actuarial equivalent of which is not less than 50 percent of the portion of the account balance of the participant (as of the date of death) to which the participant had a nonforfeitable right (within the meaning of section 1053 of this title).

575 at 1 (1984)). The REA created an exception to ERISA's general anti-alienation provision by permitting pension benefits to be disbursed to a former spouse who presents a "qualified domestic relations order" (QDRO) to a pension plan administrator. 29 U.S.C. § 1056(d)(3); *see also Directors Guild*, 234 F.3d at 419–20.

> QDROs are a subset of "domestic relations orders" ("DROs"); DROs are any orders relating "to the provision of child support, alimony, or marital property rights to a spouse, former spouse, child, or other dependent of a plan participant ... made pursuant to a State domestic relations law." 29 U.S.C. § 1056(d)(3)(ii). A DRO is a QDRO if it "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or part of the benefits payable with respect to a participant under a[n ERISA] plan[.]" 29 U.S.C. § 1056(d)(3)(B).

*Directors Guild*, 234 F.3d at 420 (footnote omitted). An alternate payee is "any spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant." 29 U.S.C. § 1056(d)(3)(K). Once a QDRO is obtained, ERISA requires that the "alternate payee," rather than the current spouse, be treated as if he or she were the current spouse "[t]o the extent provided in" the QDRO. 29 U.S.C. § 1056(d)(3)(F).

In order to qualify as a QDRO, a DRO must contain a requisite degree of specificity and meet certain substantive requirements. 29 U.S.C. §§ 1056(d)(3)(C) and 1056(d)(3)(D). These will be discussed *infra* in greater detail. When an alternate payee (*e.g.*, an ex-spouse) obtains a DRO, the alternate payee must present the DRO to the pension plan; the pension plan is responsible for determining whether the DRO meets the above requirements to create a QDRO and for notifying the participant and the alternate payee of its decision. 29 U.S.C. § 1056(d)(3)(G)(i)(II).[5] A participant or beneficiary may bring a civil action in state or federal court, *see* 29 U.S.C. § 1132(e)(1), to challenge the pension plan's determination as to whether a DRO is a QDRO or to "recover benefits due to him [or her] under the terms of his [or her] plan, to enforce his [or her] rights under the terms of the plan, or to clarify his [or her] rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1). With this review in mind, we turn to the facts of this case.

## II. *BACKGROUND*

Margot and Alfred were married in 1967 and divorced in 1989. They had no children. The divorce occurred after Alfred ceased working for employers who contributed to the Fund, and all of Alfred's pension benefits that accrued in the Fund were derived from Alfred's employment that occurred during his marriage to Margot. The January 10, 1989 Decree entered by the family court provided that:

> [Margot] is awarded a share of retirement under [Alfred's] Operating Engineers' Retirement Plan if, as, and when [Alfred] commences to receive the same. The share which [Margot] is awarded shall be computed according to the following formula:

> [ (½) x (19 years in plan/total years in plan at retirement) × ( [Alfred's] monthly gross retirement) = ( [Margot's] share) ].

> For the purpose of this allocation of [Margot's] interest, [Alfred] is the "Participant" in the aforementioned plan and [Margot] is the Alternate Payee (up to the percentage specified above) under the

---

**5.** 29 U.S.C. § 1056(d)(3)(G)(i) states in pertinent part:

> In the case of any domestic relations order received by the plan—
> (I) the plan administrator shall promptly notify the participant and each alternate payee of the receipt of such order and the plan's procedures for determining the qualified status of domestic relations orders, and

> (II) within a reasonable period after receipt of such order, the plan administrator shall determine whether such order is a qualified domestic relations order and notify the participant and each alternate payee of such determination.

aforementioned Plan within the meaning of the Retirement Equity Act of 1984.

The share awarded and assigned to the Alternate Payee from the aforementioned Plan shall be paid to the Alternate Payee if, as, and when [Alfred] commences to receive retirement benefits from the Plan. Said payment, at the option of the Alternate Payee, may be paid to the Alternate Payee directly or transferred from the aforementioned Plan to a financial institution or other third party as directed by Alternate Payee in writing to said Plan.

. . . .

The Court shall retain jurisdiction over the retirement interest described herein for as long as the parties both shall live and after either party's death.

The Court shall also have the authority to make every just and equitable order not inconsistent with any of the provisions herein.

The Court shall also have specific authority to make any orders it deems just and equitable as a result of the income tax consequences which flow from the division and distribution of the aforementioned retirement interest. It is the intent of the Court that each party shall be taxed on his or her respective share of the retirement benefits at such time(s) said share becomes subject to taxes.

The Decree also contained a reciprocal provision awarding Alfred a share of "retirement benefits" from Margot's retirement plan.

A copy of the Decree was sent to Alfred's pension fund (*i.e.*, the Fund), which acknowledged receipt of it on February 2, 1989. On March 1, 1989, the Fund sent a letter to Margot, indicating that it would determine whether the Decree met the requirements necessary to establish it as a QDRO under federal law.

Following the 1989 divorce, Alfred married Louan in October 1991. They had one child. On September 8, 1997, the Fund sent letters individually addressed to Margot and to Alfred, indicating that the Decree was not a QDRO within the meaning of ERISA. Among the problems identified by the Fund was the fact that the Decree did not clearly state whether Margot was entitled to surviving spouse benefits.

Approximately two months later, in November 1997, Alfred requested the appropriate paperwork to apply for and receive his pension benefits from the Fund; however, he had not completed the paperwork necessary to receive benefits from the Fund before he died on January 17, 1998. At the time of his death, Alfred was married to Louan. The Fund agrees that Alfred is eligible for benefits retroactive to December 1, 1997. The Fund permitted Louan, as Alfred's surviving spouse, to elect on Alfred's and her behalf that the pension benefits be paid in a "100% Contingent Annuitant" form. This payment option differs from a QJ & SA in that the contingent annuitant form provides reduced benefit payments to the participant and spouse while the participant is alive; in exchange, after the participant's death, the surviving spouse is guaranteed to receive the same amount for the remainder of his or her lifetime.

On September 1, 1998, Margot's counsel received from Louan's counsel a copy of the Fund's September 7, 1997 letter to Alfred and Margot indicating that the Fund had determined that the Decree did not constitute a valid QDRO. The record is silent as to any communication between the litigants that may have taken place between September 1997 and September 1998. Language in the Fund's amicus brief, however, suggests that benefits were not paid to Louan following Alfred's death in January 1998. Between September 1998, and June 1999, counsel for Margot and Louan engaged unsuccessfully in discussions attempting to resolve the matter of who was entitled to the survivor benefits from Alfred's pension. During this time, the Fund also advised Margot's counsel concerning the elements of a valid QDRO.

On June 23, 1999, Margot filed a motion in the family court seeking to amend the 1989 Decree by entry of a "QDRO" or for an order to compel Louan to "execute" the QDRO. It should be noted here that, although Margot's motion was fashioned as a request to enter a "QDRO," as discussed earlier, the family court can only enter a DRO; the pension plan determines whether the DRO is a

QDRO. Consequently, Margot's motion is more properly considered as a request to amend the 1989 Decree, and the family court's November 17, 1999 order, ultimately granting Margot's motion, is more properly considered as an amendment to the Decree. Hereinafter, the family court's November 17, 1999 order and the December 17, 1999 order denying Louan's motion for reconsideration will be referred to collectively as a "DRO," an "amended Decree[,]" or similar designation.

Attached to Margot's motion was an affidavit of her attorney, stating that the Decree had been sent to the Fund in 1989 and that, on March 1, 1989, the Fund had acknowledged receipt of the Decree. The affidavit further states that, "[h]owever, no word was received from the Fund until September 1, 1998, when [Louan's attorney] faxed to [Margot's attorney] a copy of the Fund's September 8, 1997 letter" addressed individually to Margot and to Alfred, stating that the Fund had determined that the Decree did not qualify as a QDRO. Through her attorney, Louan was provided notice of Margot's motion.

By special appearance, Louan filed a memorandum in opposition to Margot's motion on July 9, 1999, contending that Louan had not been made a proper party to the litigation and that the proceedings should be dismissed or continued until the proper parties were named and until she had an opportunity to conduct discovery. The hearing on the motion was thereby continued to August 4, 1999. Louan and Margot subsequently exchanged memoranda addressing primarily the substantive legal issues, discussed *infra*, pertaining to whether the family court could grant Margot's motion under state and federal law.

On August 4, 1999, the litigants apparently met with the court, and the court set a "short trial" for September 3, 1999. At the September 3, 1999 hearing, Margot and Louan presented legal argument but no testimony was taken. The family court took the matter under advisement, and, on September 10, 1999, Louan filed a second supplemental memorandum in opposition to Margot's motion.

On September 24, 1999, the family court issued a minute order [6] that read:

COURT RULED IN FAVOR OF MS. OKIMOTO [ATTORNEY FOR MARGOT]. [ATTORNEY] OKIMOTO TO PREPARE ORDER. [ATTORNEYS] WERE CONTACTED BY TELEPHONE OF THE COURT'S DECISION.

On November 17, 1999, the family court filed its findings of fact, conclusions of law, and order granting Margot's request to amend the Decree. Among the family court's findings was the statement that "[Margot] did not receive a copy of the Fund's September 8, 1997 letter until [September 1, 1998] when a copy was faxed to [Margot's] counsel by [Louan's counsel]." [7] The court also filed a DRO that same date specifying that: (1) the portion of Alfred's total, unadjusted monthly pension benefit, which accrued in the Plan during Alfred's and Margot's marriage, constituted the "marital property" of Alfred and Margot and that Margot was entitled to half of this benefit; and (2) Margot should be treated as if she were Alfred's surviving spouse with respect to Alfred's retirement benefits "for the purpose of the 50% pre-retirement surviving spouse benefit provided[,]" payable from February 1, 1998 until

6. The minute record is not part of the record on appeal and ordinarily may not be cited. *See generally* Hawai'i Rules of Appellate Procedure (HRAP) Rule 10(a) (1999). The litigants do not dispute the form and contents of the minute order and is referred to only insofar as it is necessary to resolve a jurisdictional issue. *See* discussion *infra*.

7. The family court's finding actually states that the September 7, 1997 letter was faxed to Margot's counsel by Louan's counsel on *June 1, 1998*, rather than *September 1, 1998*. The letter bears a fax imprint with the name of Louan's counsel and a date of June 1, 1998, but the significance or accuracy of this imprint is unclear. The affidavit of counsel for Margot indicates that the letter was received on September 1, 1998, and Louan states in her opening brief that she assumes that the court's reference to June 1 was a clerical error. Thus, both parties agree that the letter was received on September 1, 1998 rather than June 1, 1998. We, therefore, utilize September 1, 1998 as the operative date. The correct date is not material to the outcome of this case because, as discussed *infra*, the dispute is over the basis of the family court's finding that *Margot*, rather than Margot's *counsel*, received the September 7, 1997 letter sometime in 1998.

she dies. The effect of the family court's DRO is that, if it is qualified by the Plan, Margot would be entitled to survivor benefits as a QPRSA beginning February 1, 1998, until she dies, and Louan is not entitled to any survivor benefits from the Fund. Although not part of the record on appeal, Louan states in her opening brief that the Fund accepted the court's DRO as a QDRO in February 2000. According to Louan, she filed an administrative appeal of this determination, and the appeal was pending at the time the parties filed their briefs in this case.

Louan filed a motion for reconsideration on November 24, 1999, which was summarily denied by the family court on December 17, 1999. Louan filed a notice of appeal on January 13, 2000.

## III. *STANDARDS OF REVIEW*

▮ Questions of jurisdiction are considered de novo. *Beneficial Hawai'i v. Casey,* 98 Hawai'i, 159, 164, 45 P.3d 359, 364, *reconsideration denied,* 98 Hawai'i 159, 45 P.3d 359 (2002); *State v. Adam,* 97 Hawai'i 475, 481, 40 P.3d 877, 883 (2002). Questions of statutory interpretation are reviewed de novo. *Office of Hawaiian Affairs v. State,* 96 Hawai'i 388, 394, 31 P.3d 901, 907 (2001).

▮ The family court's legal conclusions are reviewed de novo. *See In re Doe,* 96 Hawai'i 272, 283, 30 P.3d 878, 889 (2001). Findings of fact are reviewed under the clearly erroneous standard, *id.,* and the family court's "equitable" decisions are reviewed under the abuse of discretion standard. *See*

*generally In re Doe,* 84 Hawai'i 41, 46, 928 P.2d 883, 888 (1996).

## IV. *DISCUSSION*

### A. *Appellate Jurisdiction: Timeliness of Louan's Appeal*

▮ Margot contends that this court lacks jurisdiction because Louan's appeal is untimely inasmuch as it was not filed within thirty days of the family court's September 24, 1999 minute order. Appellate jurisdiction is a base requirement to resolve an appeal, and this court has an obligation to determine that such jurisdiction exists. *See Peterson v. Hawai'i Elec. Light Co., Inc.,* 85 Hawai'i 322, 326, 944 P.2d 1265, 1269 (1997).[8]

▮ Margot submits that September 24, 1999—the date of the family court's minute order—is the relevant date for triggering the thirty-day deadline to file a notice of appeal mandated by HRAP Rule 4(a) (1985).[9] According to Margot, although a pending motion for reconsideration delays the time to file the notice of appeal, *see* HRAP Rule 4(a)(4)(v), the motion for reconsideration must be timely filed in the first place. A motion for reconsideration of a decree, order, or "decision and order" must be filed within twenty days after filing of the decree or order or announcement of the "decision and order," whichever occurs sooner. Hawai'i Family Court Rules (HFCR) Rule 59(g)(1) (1982). Margot claims that the family court's September 24, 1999 minute order constituted a valid "decision and order." Consequently, Margot maintains that a motion for reconsid-

---

**8.** There are two other issues concerning appellate jurisdiction that are not raised by the parties. First, Louan is not a formal party to the divorce action between Margot and Alfred. However, in opposing Margot's motion, she was permitted to participate in the family court proceedings as if she were a party, *see* discussion in subsection B. *infra,* and she is clearly "aggrieved" by the family court's ruling insofar as she contends that the family court's ruling has wrongfully caused her to lose the survivor benefits to which she would otherwise be entitled. *Consequently, we hold* that Louan has standing to appeal the family court's ruling. *Cf. Makani Dev. Co., Ltd. v. Riley,* 4 Haw.App. 542, 543 n. 1, 670 P.2d 1284, 1286 n. 1 (1983) (purchaser at a judicial foreclosure sale had standing to appeal even though not a party to the foreclosure proceeding).

Second, the family court's orders are neither (1) a final judgment, order, or decree, *see* HRS §§ 571–54 and 641–1(a), or (2) a certified interlocutory order, HRS § 641–1(b), the two primary types of appealable orders. Nonetheless, the family court's orders conclusively determined the disputed issue of who was entitled to the rights to survivor benefits and are sufficiently distinct from the remainder of the divorce proceeding to meet the "requisite degree of finality of an appealable order." *In re Doe,* 96 Hawai'i at 283, 30 P.3d at 889 (citation and internal quotation marks omitted). Consequently, we hold that it has jurisdiction to consider Louan's appeal.

**9.** The applicable HRAP and family court rules discussed in this subsection have been substantially revised since Louan filed her motion for reconsideration and notice of appeal.

eration should have been filed within twenty days of September 24, 1999 in order to delay the time for appeal. Because Louan's motion for reconsideration was not filed until November 24, 1999—seven days after entry of the written DRO but two months after the date of the court's minute order—Margot contends that the time to file the notice of appeal was not delayed by operation of rule and that, accordingly, Louan's December 17, 1999 notice of appeal was untimely. Margot's contention is without merit.

A "decision and order" of the family court was defined as "a written or oral decision issued by the court determining all or part of the issues raised by a pleading or pleadings in any action, *where appropriate orders are embodied in or announced together with the decision.*" HFCR Rule 54(a)(3) (1982) (emphasis added). The family court's September 24, 1999 minute order, notifying the parties that it had decided in favor of Margot, did not "embody" or "announce" appropriate orders; the court's reasoning and the precise contours of its decision remained to be expressed in the written order. Consequently, the time within which Louan was required to file her motion for reconsideration did not begin on September 24, 1999.

▮ Pursuant to HRS § 571–54 (1993), "[a]n interested party aggrieved by any order or decree of the [family] court may appeal to the supreme court for review of questions of law and fact upon the same terms and conditions as in other cases in the circuit court . . . ." The thirty-day time limit to file a notice of appeal from circuit court or family court cases runs from entry of the "judgment or order appealed from." *See* HRAP Rule 4(a). The applicable family court rules do not define the term "order," but define the term "decree" as including "a *written* decree, a *written* judgment or any *written* order from which an appeal lies." HFCR Rule 54(a)(1) (1982) (emphases added). Accordingly, under the circumstances of this case, the time period within which Louan was required to file her notice of appeal began on November 17, 1999, the date that the family court filed its *written* DRO—not September 24, 1999, the date of the family court's minute order.

Although the thirty-day time period to file the notice of appeal began to run on November 17, 1999, it was delayed beginning on November 24, 1999, when Louan timely filed her motion for reconsideration. Pursuant to HRAP Rule 4(a)(4)(v), if a timely motion for reconsideration is filed, "the time for appeal for all parties shall run from the entry of the order" granting or denying the motion. The family court entered its order denying Louan's motion for reconsideration on December 17, 1999. Louan filed her notice of appeal on January 13, 2000. Accordingly, we hold that Louan's appeal is timely and that this court has appellate jurisdiction over the case.

B. *Status of Alfred's Estate and Louan as Proper Parties to this Action*

▮ Louan contends that the family court erred in granting Margot's motion because neither Alfred's estate nor Louan are parties to this action. Louan points out that HFCR Rule 25(a) (1982) requires the family court to dismiss the action in the event of the death of a party if a proper representative of the party is not substituted for the deceased party. Margot submits that the doctrine of judicial estoppel should prevent Louan from advancing this argument. We agree with Margot.

Margot's motion is a continuation of a divorce proceeding between Margot and Alfred. HFCR Rule 25(a)(1) (1982) states:

If a party dies and the case is not thereby extinguished, the court may on motion order substitution of the proper parties where appropriate. The motion for substitution may be made by the successors or representatives of the deceased party or by any party and, together with the notice of hearing, shall be served on the parties as provided in Rule 5 and upon persons not parties in the manner provided in Rule 4 for the service of process. *Unless the motion for substitution is made not later than 180 days after the death is suggested upon the record by service of a statement of the fact of the death as provided herein for the service of the motion, the action shall be dismissed as to the deceased party.*

(Emphasis added.) Margot, as the other party to the divorce action, or perhaps Louan, as a claimed "successor or representative" to Alfred's retirement interests, should have moved for substitution of a personal representative or special administrator to represent Alfred's estate. *See* HRS § 560:3–104 (Supp.1998) ("No proceeding to enforce a claim against the estate of a decedent or the decedent's successors may be revived or commenced before the appointment of a personal representative.").

■ However, the foregoing defect does not require this court to vacate the family court's ruling. To begin, the primary dispute in this case concerns survivor benefits that are directly payable to either Louan or Margot and are not subject to testamentary or intestate transfer. *See generally Boggs v. Boggs*, 520 U.S. 833, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997). Moreover, under the doctrine of judicial estoppel,

> a party will not be permitted to maintain inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him [or her], at least where he [or she] had, or was chargeable with, full knowledge of the facts, and another will be prejudiced by his [or her] action.

*Roxas v. Marcos*, 89 Hawai'i 91, 124, 969 P.2d 1209, 1242 (1998), *reconsideration denied*, 89 Hawai'i 91, 969 P.2d 1209 (1998) (brackets omitted); *see also Rosa v. CWJ Contractors, Ltd.*, 4 Haw.App. 210, 218, 664 P.2d 745, 751 (1983).

In this case, Louan asserted in her first memorandum opposing Margot's motion that she was not a proper party to the action and requested dismissal or a continuance to substitute the proper parties or to conduct discovery. A continuance was granted shortly thereafter. Nevertheless, Louan did not move to substitute the proper party on Alfred's behalf or to intervene, pursuant to HFCR Rule 24(a) (1982),[10] on her own behalf. In addition, Louan does not point to

anywhere in the record demonstrating an attempt on her part to conduct discovery. Instead, Louan filed additional memoranda opposing Margot's motion primarily on the substantive legal grounds discussed herein. Furthermore, Louan appeared at the September 3, 1999 hearing, filed a motion for reconsideration of the family court's November 17, 1999 order, and fully participated in all of the relevant family court proceedings. Thus, Louan has participated in all practical respects as a "party" to protect her asserted interests throughout this litigation. It is inconsistent for her to now claim that she is not such a "party," and, allowing her to do so would prejudice Margot, who has relied upon Louan's participation in the proceedings. Accordingly, we hold that Louan is estopped from claiming that she was not a proper party to this case for the purpose of defending her claim to survivor benefits from the Fund. *See Ross v. Ross*, 308 N.J.Super. 132, 705 A.2d 784, 790–92 (1998) (surviving spouse who participated fully in family court proceedings disputing ex-spouse's claim to retirement benefits was bound by family court's judgment notwithstanding the fact that she was not formally a party to the action).

### C. *Jurisdiction of the Family Court Pursuant to the Language of the Decree and HRS § 580–56*

Louan contends that the language of the Decree and HRS § 580–56 (quoted *infra*) do not permit the family court to exercise jurisdiction over the rights to survivor benefits from Alfred's pension. We disagree with both of these contentions.

#### 1. Language of the Decree

■ Louan contends that the family court did not have jurisdiction to amend the Decree in the manner in which it did because survivor benefits were not contemplated by the language of the initial Decree. Louan submits that the language in the Decree,

---

10. HFCR Rule 24(a)(2) permits an individual to seek intervention "when the applicant claims an interest relating to the property, transaction or custody or visitation of a minor child which is the subject of the action and [the applicant] is so situated that the disposition of the action may as a practical matter impair or impede [the applicant's] ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

specifying that Margot should receive benefits "if, as, and when" Alfred commences to receive them, indicates that Margot's receipt of benefits in the initial Decree was conditioned on Alfred's eligibility for benefits. Louan points out that, in contrast, the amended Decree provided Margot with a *preretirement* survivor annuity—*i.e.,* a benefit payable to her should Alfred die *before* he retired and became eligible for benefits. Thus, according to Louan, the amended Decree awarded Margot something that was not described in the initial Decree and, consequently, the family court had no jurisdiction to do so. Margot, on the other hand, points out that the initial Decree permitted the family court to enter orders that are "just and equitable" so long as the orders are not inconsistent with any other provision of the Decree. She submits that the amended Decree, permitting her to receive surviving spouse benefits, is "just and equitable" because she was married to Alfred during the entire course of his employment that led to the pension benefits. According to Margot, there is nothing in the amended Decree that is inconsistent with the initial Decree. We agree with Margot.

 Louan, for her part, does not contend that it is inequitable for Margot to receive the surviving spouse benefits. Rather, Louan relies on case law in which several courts have construed DROs so as not to provide survivor benefits where express language mentioning such benefits is absent. For example, in *Robson v. Electrical Contractors Association Local 134 IBEW Joint Pension Trust of Chicago, Pension Plan No. 5,* 312 Ill.App.3d 374, 245 Ill.Dec. 245, 727 N.E.2d 692, *reh'g denied,* 312 Ill.App.3d 374, 245 Ill.Dec. 245, 727 N.E.2d 692 (2000), the Illinois Court of Appeals, construing an apparently valid QDRO, held that a former spouse of a pension participant was not entitled to surviving spouse benefits because the language of the QDRO did not expressly provide for such benefits. *See id.* at 698. As the court pointed out, a QDRO must be drafted "to include very specific information with explicit instructions to the plan administrator." *Id.* at 697; *see also supra* at 403, 60 P.3d at 804. A QDRO that fails to expressly provide for survivor benefits will not entitle

the person named to receive survivor benefits from the pension plan. *See id.* at 698. In the instant case, however, the family court was not asked to determine whether the initial Decree met the stringent requirements to qualify it as a valid QDRO under federal law; as noted earlier, this task falls to the Plan. Rather, the family court was asked to exercise its authority, under state law, to issue a "just and equitable" order amending the Decree. The degree of specificity needed for the latter is not governed by federal law. Thus, *Robson* is distinguishable from the instant case. Likewise, *Dorn v. International Brotherhood of Electrical Workers,* 211 F.3d 938 (5th Cir.2000), also cited by Louan, is distinguishable on similar grounds. *See id.* at 946–47.

Louan further relies upon *Quade v. Quade,* 238 Mich.App. 222, 604 N.W.2d 778 (1999). In *Quade,* the Michigan Court of Appeals affirmed a trial court's decision refusing to enter a DRO to provide for early retirement benefits because the divorce decree did not expressly and specifically provide for such benefits. *See id.* at 779–80. Although the appellate court appeared to base its decision on this ground, the decree in *Quade* also contained additional evidence supporting the court's decision in the form of handwritten language suggesting that the parties had considered and, inferentially, rejected, the applicability of early retirement benefits. *See id.* at 780. Thus, *Quade* is also distinguishable insofar as additional affirmative evidence—not present in this case—supported the Michigan court's determination that the decree did not contemplate early retirement benefits. Similarly, the court in *Samaroo v. Samaroo,* 193 F.3d 185 (3d Cir.1999), another case cited by Louan, discusses additional evidence supporting its conclusion that a divorce decree lacking express mention of survivor benefits does not provide for such benefits, *see id.* at 188 n. 2, and, in any event, the conclusion is dictum. *See id.*

Louan also points to *Roth v. Roth,* 201 Mich.App. 563, 506 N.W.2d 900 (1993). In *Roth,* the appellate court affirmed a trial court's refusal to amend a divorce decree in order to provide for a preretirement survivor annuity for an ex-spouse because the decree

did not expressly provide for such benefits. *See id.* at 903–04. The provision in the decree describing the ex-spouse's entitlement to receive a "distribution" from the participant's pension plan was similar to the provision in the Decree in this case. *See id.* at 901. However, there is nothing in *Roth* which suggests that the decree in that case permitted the trial court to retain primary jurisdiction to enter "just and equitable" orders regarding the retirement issue. The Michigan appellate court's reasoning was based in part upon its conclusory statement that, "as written, the judgment precludes distribution of pension benefits to plaintiff [ex-spouse] until defendant [plan participant] begins to and only for so long as he does receive them." *Id.* at 903. The court concluded that, "regrettably, the law affords plaintiff no relief" from the terms of the decree. *Id.* at 904.

Most significantly, the plaintiff's motion to amend the decree in *Roth* was brought pursuant to Michigan Rules of Court (MCR) Rule 2.612(C) (1985), Relief from Judgment or Order, which is similar to HFCR Rule 60(b).[11] *See Roth,* 506 N.W.2d at 903. The required showing for relief under this rule is clearly higher than when a case is being considered pursuant to the court's primary, or continuing, jurisdiction in the first instance, as in this case. *See generally Heugel v. Heugel,* 237 Mich.App. 471, 603 N.W.2d 121, 124 (1999). Apparently applying the standard outlined by MCR 2.612(C)(1)(f), the court in *Roth* determined that there were no "extraordinary circumstances" that would permit it to exercise its discretion to modify the divorce judgment because the plaintiff was charged with knowledge of the law at the time of the divorce and "knew" that the decree did not provide for these benefits. *See Roth,* 506 N.W.2d at 903. In contrast to *Roth,* the language of the Decree in this case permitted the family court to retain primary jurisdiction to enter "just and equitable" orders over the retirement interest at issue. Accordingly, the Michigan court's decision in *Roth* is not directly applicable to this case.

In sum, Louan has not met her burden of establishing that the family court abused its discretion in amending the Decree, and *we* hold that the language of the Decree does not prohibit the family court from so doing.

## 2. HRS § 580–56

Louan also contends that the DRO violates HRS § 580–56. She submits that HRS § 580–56 requires the family court to "expressly reserve" its jurisdiction over Margot's and Alfred's property and that it did not do so in the Decree. Louan also appears to argue that the DRO violates HRS § 580–56 because it divides Alfred's property. These arguments require a closer review of HRS § 580–56.

 HRS § 580–56 provides in relevant part:

(a) Every decree of divorce which does not specifically recite that the final division of the property of the parties is reserved for further hearing, decision, and orders

---

11. MCR Rule 2.612(C) states:

Grounds for Relief From Judgment.
(1) On motion and on just terms, the court may relieve a party or the legal representative of a party from a final judgment, order, or proceeding on the following grounds:
(a) Mistake, inadvertence, surprise, or excusable neglect.
(b) Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under MCR 2.611(B).
(c) Fraud (intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party.
(d) The judgment is void.
(e) The judgment has been satisfied, released, or discharged; a prior judgment on which it is based has been reversed or other-

wise vacated; or it is no longer equitable that the judgment should have prospective application.
(f) Any other reason justifying relief from the operation of the judgment.
(2) The motion must be made within a reasonable time, and, for the grounds stated in subrules (C)(1)(a), (b), and (c), within one year after the judgment, order, or proceeding was entered or taken. A motion under this subrule does not affect the finality of a judgment or suspend its operation.
(3) This subrule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding; to grant relief to a defendant not actually personally notified as provided in subrule (B); or to set aside a judgment for fraud on the court.

shall finally divide the property of the parties to such action.

. . . .

(d) Following the entry of a decree of divorce, or the entry of a decree or order finally dividing the property of the parties to a matrimonial action if the same is reserved in the decree of divorce, or the elapse of one year after entry of a decree or order reserving the final division of property of the party, a divorced spouse shall not be entitled to dower or curtesy in the former spouse's real estate, or any part thereof, *nor to any share of the former spouse's personal estate.*

(Emphasis added.) The "personal estate" of either party includes personal property such as retirement benefits. *See Linson v. Linson,* 1 Haw.App. 272, 278, 618 P.2d 748, 751, *reconsideration denied,* 1 Haw.App. 665, 618 P.2d 748 (1980). Thus, the statute mandates that, when the family court issues a divorce decree, the decree is final with respect to its division of the parties' property unless the court specifically retains jurisdiction for the purpose of additional property division. If the family court retains jurisdiction for further property division, it loses such jurisdiction and may not permit either party access to the property of the other party (1) once the court subsequently divides the property, or (2) after the passage of one year, whichever occurs first. *See Boulton v. Boulton,* 69 Haw. 1, 3–4, 730 P.2d 338, 339 (1986).

In this case, although the Decree permitted the family court to retain jurisdiction for the purpose of issuing "just and equitable" orders pertaining to the retirement interest, the Decree did not expressly provide for further *division* of Margot's and Alfred's property. Rather, the Decree permits the family court to issue orders, *inter alia,* requiring the parties to make payments to one another to equalize income tax liabilities or, arguably, amending the Decree in order to correct errors that would disqualify

the Decree as a QDRO. Moreover, even if the Decree did provide for further division of the parties' property, the strictures of HRS § 580–56 forbid the family court from doing so after the passage of one year. Accordingly, it is necessary to examine whether the November 1999 DRO further divided the retirement interest in a manner that permitted Margot to receive benefits that would ordinarily flow to Alfred. If so, then the amended Decree violated HRS § 580–56.

We conclude that nothing in the record suggests that, in permitting Margot to obtain a preretirement survivor annuity, the amended Decree affected Alfred's personal entitlement to retirement benefits. If the initial Decree had not been amended and Alfred had lived to commence collecting retirement benefits, his pension plan would have permitted him to receive benefits in the form of a QJ & SA. As noted earlier, a QJ & SA would have permitted Alfred to receive a fixed income for his lifetime, and if his spouse survived him, she would have been entitled to receive at least fifty percent of that fixed income for the remainder of her life. 29 U.S.C. § 1055(d). However, even if the initial Decree had been amended, as it was here, and Alfred had begun to collect his retirement benefits, he would still have been entitled to the same benefits in the form of a QJ & SA. Similarly, even if Alfred had died before collecting retirement benefits, his surviving spouse, as defined by ERISA, would have been entitled to collect benefits in the form of a QPRSA in which Alfred would not collect benefits individually. *See* 29 U.S.C. § 1055(e). Thus, Alfred would have been entitled to the same benefits regardless of whether or not the family court amended the Decree. Accordingly, the family court's order amending the Decree did not change Alfred's benefits and did not permit Margot to obtain any portion of Alfred's property that would otherwise have accrued to Alfred.[12]

12. In addition to the QJ & SA, federal law also requires that pension plans permit a recipient to elect to waive the QJ & SA form of benefit during a specified applicable period, *see* 29 U.S.C. § 1055(c)(1), presumably to receive benefits in some other form such as a lump sum payment or the "100% Contingent Annuitant" form of pay-

ment which Louan was permitted to elect on behalf of herself and Alfred. Thus, it could be argued that, by amending the Decree, the family court divided a portion of Alfred's personal property by depriving him of the right to elect to waive the QJ & SA and receive some other form of payment. However, the waiver of the right to

Based upon the foregoing reasoning, we hold that the family court's DRO amending the Decree was not inconsistent with the language of the initial Decree or the strictures of HRS § 580–56. Consequently, the family court possessed appropriate jurisdiction to amend the Decree.

### D. Family Court's Findings Regarding When Margot Learned That the 1989 Decree Was Not a QDRO

■ Louan next contends that the family court's finding of fact that "[Margot] did not receive a copy of the Fund's September 8, 1997 letter until [September 1, 1998] when a copy was faxed to [Margot's] counsel by [Louan's counsel]" is clearly erroneous. Louan submits that the declaration of Margot's counsel averring that the Decree was submitted to the Fund in 1989 and that "no word was received from the Fund until September 1, 1998, when [Louan's attorney] faxed to [Margot's counsel] a copy of the Fund's September 8, 1997 letter" does not support the family court's finding that *Margot* did not receive a letter from the Fund earlier. Louan is correct.

■ Under the clearly erroneous standard of review, this court will not disturb a finding of fact unless it is "left, after examining the record, with a definite and firm conviction that a mistake has been committed. The test on appeal is whether there was substantial evidence to support the conclusion of the trier of fact. Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *In re Doe*, 96 Hawai'i at 283, 30 P.3d at 889 (citation omitted). Here, the record contains an acknowledgment by the Fund that it received the Decree in 1989. However, the affidavit of Margot's counsel, stating that "no word" was received from the Fund until 1998 is competent evidence only as to when Margot's counsel received the letter.

Counsel's affidavit is hearsay and irrelevant with respect to Margot's knowledge of the letter and cannot support the trial court's finding that Margot did not receive the letter until 1998. Because there is no other evidence suggesting that Margot did not receive the letter until 1998, the family court's finding is unsupported in the record. Accordingly, we hold that the family court's finding is clearly erroneous.

■ Louan urges that the family court's decision should be reversed on the basis of the foregoing error. Louan points out that, in a reply memorandum to the family court, Margot argued that her delay in requesting the amended Decree was justified because she did not learn of the Plan's failure to qualify the decree as a QDRO until 1998. Louan further points out that Margot was informed by the Fund in 1989 that it would advise her as to its determination regarding the qualified status of the decree and that, "[n]otwithstanding this notice, Margot apparently never inquired about the status of the Fund's determination." Louan contends that Margot "sat on her rights" and, presumably, cannot now seek to have the Decree amended. We disagree.

HRS § 641–2 (1993) provides in pertinent part that "[n]o judgment, order or decree shall be reversed, amended or modified for any error or defect unless the court is of the opinion that it has injuriously affected the substantial rights of the appellant." In order for the court's erroneous finding to constitute reversible error, Louan must indicate how the erroneous finding affected the outcome of the court's decision. *See Wright v. Wright*, 1 Haw.App. 581, 585, 623 P.2d 97, 100 (1981). She has not done so. Louan points to nothing in the record to suggest the events that transpired between either (1) the Fund's 1989 letter acknowledging receipt of the Decree and the Fund's September 7, 1997 letter addressed to Margot and Alfred; or (2) the September 7, 1997 letter and September 1,

---

collect benefits as a QJ & SA must be consented to by the participant's spouse. *See* 29 U.S.C. § 1055(c)(2). The person named in a QDRO is treated as the participant's spouse for purposes of collecting survivor benefits and consenting to the collection of benefits in some form other than a QJ & SA. *See* 29 U.S.C. § 1056(d)(3)(F). Thus,

by amending the Decree to create a subsequent QDRO, the family court effectively changed the identity of the "spouse" who could collect survivor benefits and consent to the collection of benefits in some form other than a QJ & SA. Such an order, however, does not affect Alfred's interest in or entitlement to pension benefits in any way.

1998, when Margot's counsel became aware of the letter's existence. Similarly, Louan points to nothing in the record concerning the communications, actions, or motivations of the parties until after September 1998. As an active participant in the relevant proceedings, Louan could have introduced evidence concerning factual matters that might have influenced the family court's discretionary determination to amend the Decree.[13] However, she did not do so. Instead, Louan chose to focus primarily on the legal—rather than factual—grounds for opposing Margot's motion. Accordingly, because Louan has not shown how the family court's erroneous finding of fact affected the court's decision in this case, we hold that the erroneous finding did not affect Louan's substantial rights and does not constitute reversible error.

### E. Whether the Amended Decree Interferes with Louan's Vested Rights Under ERISA

Louan contends that the family court erred by amending the Decree in favor of Margot because, under ERISA, the right to surviving spouse benefits associated with a participant's retirement plan vests in the participant's spouse on the date that the participant retires. Because Alfred was eligible for retirement benefits beginning December 1, 1997, and the Fund agrees that—had he not died—Alfred would have received benefits retroactive to that date, Louan submits that the rights to surviving spouse benefits vested in her on that date and that, therefore, the family court could not subsequently enter a DRO entitling Margot to these benefits. Alternatively, Louan contends that, under ERISA, the right to surviving spouse benefits vested in her when Alfred died and that the family court, for the same reason, could not subsequently award these benefits to Margot. We disagree with both contentions.

### 1. Vesting of Retirement Benefits in Current Spouse Upon Participant's Retirement

To support her contention that surviving spouse benefits vested in her on the date of Alfred's eligibility for retirement, Louan relies upon authority from the Third, Fourth, and Fifth Federal Circuits, which is discussed *infra*. The Fund, in contrast, calls our attention to *Directors Guild, supra*, in support of its contention that Louan did not obtain vested rights to Alfred's pension benefits because Margot secured an interest in those rights prior to Alfred's retirement. Reviewing these arguments and the applicable portion of ERISA, we hold that the family court's DRO is not inconsistent with the provisions of ERISA and that, therefore, the family court did not err. First, we explain why ERISA does not prohibit the family court's DRO; second, we explain why we believe that the case law relied upon by Louan is either incorrect or distinguishable.

In *Directors Guild*, Suzanne Tise, the ex-spouse, had obtained a child support judgment against the pension plan participant, Charles Myers, in state court.[14] *Directors Guild*, 234 F.3d at 417. Over the course of the next ten years, Myers did not pay the judgment. *See id.* In an effort to collect the arrearage, Tise returned to state court in 1991 and secured an order effectively barring Myers's pension plan from disbursing any proceeds of the plan to Myers without first notifying Tise. *See id.* When the pension plan informed Tise in 1994 that she did not have a valid QDRO, Tise initiated state court proceedings to obtain an order that could be qualified as a QDRO and to enjoin the pension plan from distributing the proceeds of the pension until the order was issued. *See id.* at 418. Various proceedings ensued over the course of the next two years, during which Myers died before entry of the order sought by Tise. *See id.* at 418–19. Prior to

---

13. As indicated earlier, if Louan's status as a nonparty was an impediment to conducting discovery, she could have moved to intervene pursuant to HFCR Rule 24. *See supra* at 408, 60 P.3d at 809.

14. Tise had actually never been married to Myers but was placed in the same legal position as an ex-spouse due to the fact that she represented the interests of the couple's minor children and thus was an appropriate "alternate payee" under ERISA. *See Directors Guild*, 234 F.3d at 420 n. 3 and discussion *infra* concerning an "alternate payee." The distinction is not material to this case.

his death, Myers named another individual, Yvonne Curry, as the beneficiary of the death benefits payable under the plan.[15] *Id.* at 418. In April 1996—after Myers had died—the state court entered an order, effective *nunc pro tunc* to 1991, enabling Tise to collect upon the child support arrearage by attaching the death benefits payable under the plan. *See id.* at 419. Curry, however, claimed that she, and not Tise, was entitled to the death benefits because, under ERISA, the benefits became vested in Curry upon Myers's death. *See id.* at 419. Therefore, Curry claimed that the state court's April 1996 order was unenforceable. *Id.* The pension plan filed an interpleader action in federal district court, and the district court ruled that the April 1996 order was enforceable, entitling Tise to an appropriate portion of the death benefits. *See id.* at 418–19.

Affirming, the United States Court of Appeals for the Ninth Circuit noted that "the QDRO provisions of ERISA do not suggest that [the ex-spouse] has no interest in the plan until she obtains a QDRO, they merely prevent her from enforcing" an already-existing interest until the QDRO is obtained. *Id.* at 421 (citing *In re Gendreau,* 122 F.3d 815, 819 (9th Cir.1997), *cert. denied,* 523 U.S. 1005, 118 S.Ct. 1187, 140 L.Ed.2d 318 (1998)) (internal quotation marks and brackets omitted). Thus, the Ninth Circuit essentially held that Tise had an "already-existing interest" in Myers's pension plan before he died in the form of state court orders affecting his pension benefits. *See id.* at 421–23. The court concluded that, "[b]ecause a QDRO only renders enforceable an already-existing interest, there is no conceptual reason why a QDRO must be obtained before the plan participant's benefits become payable on account of his retirement or death." *Id.* at 421. The court based its conclusion on its analysis of "[s]everal features of [ERISA's] language and structure[,]" *id.,* which we now discuss.

*Directors Guild* points out that there is no express language in ERISA mandating that a QDRO be obtained before the initial payout

of benefits. *Id.* Indeed, the case against such a requirement is stronger than the mere argument that it is not expressly mentioned. An analysis of the language and structure of the relevant provisions of ERISA demonstrates that the lack of an express requirement that a QDRO be obtained before the initial payout of benefits is consistent with, and an essential part of, the overall scheme and intent of the law.

Under the pre-REA version of ERISA, a broad preemption provision superseded contradictory state law. The preemption provision, which is still in effect, states in relevant part that

> the provisions of this subchapter [including 29 U.S.C. §§ 1055 and 1056] ... shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit ....

29 U.S.C. § 1144(a). This preemption provision initially applied to ERISA's prohibition against the alienation or assignment of benefits, ERISA (1974) § 206(d)(1), 88 Stat. at 864 (now codified at 29 U.S.C. § 1056(d)(1)), and continues to do so. The anti-alienation provision states that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated."

However, the REA created an exception to ERISA's anti-alienation provision by providing that benefits could be alienated or assigned pursuant to a QDRO. Section 1056(d)(3)(A) states:

> Paragraph (1) [the anti-alienation provision] shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, except that paragraph (1) shall not apply if the order is determined to be a *qualified* domestic relations order. Each pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order.

---

**15.** Myers apparently died before retirement because the court stated that, "[u]nder the terms of [Myers's] pension plan, death benefits, in the form of 120 monthly payments equivalent to those Myers would have received himself had he

retired the day before he died, then became payable to his designated beneficiary." *Id.* at 418. The court did not explain why Myers's benefits were not paid in the form of a QPRSA. The distinction, however, is not relevant to this case.

(Emphasis added.) When a QDRO is obtained, ERISA mandates that:

To the extent provided in any qualified domestic relations order—. . . the former spouse of a participant shall be treated as a surviving spouse of such participant for purposes of section 1055 of this title (and any spouse of the participant shall not be treated as a spouse of the participant for such purposes)[.]

29 U.S.C. § 1056(d)(3)(F)(i). Thus, through the vehicle of a QDRO, the REA amended ERISA to create a mechanism whereby a participant's former spouse is entitled to be treated as the "current" spouse for purposes of receiving the benefits of a QJ & SA, qualified preretirement annuity, other form of benefit, or for purposes of waiving the QJ & SA.

Under ERISA, the term "qualified domestic relations order" or QDRO connotes a very specific meaning. According to 29 U.S.C. § 1056(d)(3)(B)(i):

[T]he term "qualified domestic relations order" means a domestic relations order—

(I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

(II) with respect to which the requirements of subparagraphs (C) and (D) are met[.]

The requirements of subparagraphs (C) and (D) will be discussed *infra*. In the context of a QDRO, an "alternate payee" is "any spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant." 29 U.S.C. § 1056(d)(3)(K). Finally, the term "domestic relations order" or DRO (in contrast to a "qualified" DRO) means:

any judgment, decree, or order (including approval of a property settlement agreement) which—

(I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former

spouse, child, or other dependent of a participant, and

(II) is made pursuant to a State domestic relations law (including a community property law).

29 U.S.C. § 1056(d)(3)(B)(ii).

The relevance of the foregoing is that ordinary state domestic relations law creates a DRO. However, any such DRO that awards benefits from an ERISA-qualified pension plan to someone other than the participant or "default" beneficiary as provided by ERISA is unenforceable against a pension plan unless the DRO is "qualified." As discussed *supra*, the pension plan determines whether the domestic relations order is properly qualified under federal law, 29 U.S.C. § 1056(d)(3)(G), and the plan's determination may be reviewed in state or federal court. 29 U.S.C. §§ 1132(a)(1)(B) and (e)(1). As further noted *supra*, *see* 29 U.S.C. § 1056(d)(3)(B)(i)(II), the qualification requirements that establish a DRO as a QDRO are listed in 29 U.S.C. §§ 1056(d)(3)(C) and (D). We turn now to these qualification requirements.

Subparagraph (C) states:

A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies—

(i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(iii) the number of payments or period to which such order applies, and

(iv) each plan to which such order applies.

29 U.S.C. § 1056(d)(3)(C). The requirements in this subparagraph describe the degree of specificity which a DRO must contain in order to qualify it as a QDRO [hereinafter, specificity requirements]. Note that there is nothing in the specificity requirements that addresses substantive state domestic rela-

tions law; their effect is simply that, in order to overcome ERISA's preemption of state law, the state DRO must contain a requisite degree of written specificity.

Subparagraph (D) contains additional requirements needed to establish a DRO as a QDRO. Subparagraph (D) states:

A domestic relations order meets the requirements of this subparagraph only if such order—

(i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

(ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

(iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

29 U.S.C. § 1056(d)(3)(D). The requirements of subparagraph (D) provide that, in order to overcome ERISA's preemption of state law, the state DRO must meet certain substantive requirements. More succinctly, the state DRO cannot require the Plan to provide benefits: (i) in a form not contemplated by the provisions of the plan; (ii) in a greater amount than contemplated by the provisions of the plan; and (iii) that are already committed to someone else pursuant to an earlier state court order. The obvious import of these substantive requirements is to protect pension plans from being raided by state court orders that would require plan administrators to pay out benefits not provided for, or contemplated by, the plan contract or federal law. Thus, by not recognizing such orders as "qualified," ERISA preempts any state court order that would endanger the resources of a pension plan. *Cf. Dickerson v. Dickerson*, 803 F.Supp. 127, 133 (E.D.Tenn.1992) ("the intent of Congress in enacting ERISA was to protect the fiscal integrity of covered pension plans for the benefit of all of their participants") (emphasis omitted).

When viewed in conjunction with subparagraph (D), it is evident that the specificity provisions of subparagraph (C) serve a similar purpose. In particular, by mandating a requisite degree of specificity in order to qualify a DRO as a QDRO, subparagraph (C) ensures that plan administrators will be able to precisely identify their future obligations. Thus, both the specificity and substantive requirements enable plan administrators to fulfill their principal fiduciary obligations to participants and beneficiaries, as well as serve to implement one of ERISA's primary goals of providing a secure retirement income for the nation's workforce.

▪ Notably absent from any of the foregoing provisions is any mention that benefits "vest" in any one of two or more beneficiaries with *competing claims* to those benefits. Nor would such a provision reflect the primary concern of ERISA or be essential to its operation. The resolution of competing claims involving such matters as alimony, child support, and property (including pension interests) accrued during a marriage is entirely within the province of state domestic relations law; as illustrated above, ERISA's "qualification" of such domestic relations orders is concerned solely with enabling the plan to fulfill its fiduciary duties by ensuring that its obligations are clear and its liabilities are kept within the bounds of its contract and federal law. As long as ERISA's qualification requirements are met, any DRO permissible under state domestic relations law should be binding upon a pension plan. When Congress provided that a benefit should be available to "surviving spouses," *see, e.g.*, 29 U.S.C. § 1055(a)(2), it expressly left to state law the determination of the *identity* of such surviving spouse. *See* 29 U.S.C. § 1056(d)(3)(F)(i) ("To the extent provided in any qualified domestic relations order ... *the former spouse of a participant shall be treated as a surviving spouse of such participant for purposes of section 1055* of this title (and any spouse of the participant shall not be treated as a spouse of the participant for such purposes)[.]") (Emphasis added.); *see also Boggs*, 520 U.S. at 848, 117 S.Ct. 1754 ("As a general matter, the whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the

United States. Support obligations, in particular, are deeply rooted moral responsibilities that Congress is unlikely to have intended to intrude upon.") (Internal citations and quotation marks omitted.); *cf. In re Marriage of Oddino*, 16 Cal.4th 67, 65 Cal. Rptr.2d 566, 939 P.2d 1266, 1272 (1997) ("To the extent former spouses and dependents have rights in a participant's retirement benefits, those rights derive not from ERISA, but from state domestic relations law."); *see generally Patton v. Denver Post Corp.*, 179 F.Supp.2d 1232, 1238 (D.Col.2002) (concluding that "there is nothing in [ERISA] or its legislative history" that precludes state courts from exercising their authority to grant retrospective relief in a domestic relations case); *Hogle v. Hogle*, 732 N.E.2d 1278, 1279, 1284 (Ind.Ct.App.2000) (holding that ERISA did not prevent an Indiana state court from attaching the defendant's pension assets based upon a California writ of execution entered to enforce an alimony arrearage). Thus, nothing in the structure of ERISA supports Louan's claim that survivor benefits "vested" in her at Alfred's retirement. The most that can be inferred from the foregoing structure is that, under ERISA, the pension plan has a right to know the sum total of its actuarial obligation at a reasonable point in time—such as the participant's retirement or, perhaps if it occurs earlier, the participant's death—and that, after such point in time, state court orders cannot increase a plan's obligation. Therefore, as long as it does not adversely affect pension plans in such a manner, there is nothing in the language or structure of ERISA that requires a QDRO to be obtained before pension benefits are initially paid out at the participant's retirement.

In addition to the foregoing, language in 29 U.S.C. § 1056(d) appears to specifically anticipate, and provide for, situations in which a valid QDRO does not issue until *after* a participant's benefits are initially paid out. Subparagraphs (G) and (H) identify the responsibilities of a pension plan once it receives a DRO. Specifically, "[o]nce the pension plan is on notice that a domestic relations order has issued that may be a QDRO, the plan may take a reasonable period to determine whether the order is a QDRO and therefore creates obligations for the pension plan." *Directors Guild*, 234 F.3d at 421 (emphasis in original omitted); 29 U.S.C. § 1056(d)(3)(G)(i). With respect to this "reasonable period," subparagraph (H) states in its entirety:

(i) During any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined (by the plan administrator, by a court of competent jurisdiction, or otherwise), the plan administrator shall separately account for the amounts (hereinafter in this subparagraph referred to as the "segregated amounts") which would have been payable to the alternate payee during such period if the order had been determined to be a qualified domestic relations order.

(ii) If within the 18-month period described in clause (v) the order (or modification thereof) is determined to be a qualified domestic relations order, the plan administrator shall pay the segregated amounts (including any interest thereon) to the person or persons entitled thereto.

(iii) If within the 18-month period described in clause (v)—

(I) it is determined that the order is not a qualified domestic relations order, or

(II) the issue as to whether such order is a qualified domestic relations order is not resolved,

then the plan administrator shall pay the segregated amounts (including any interest thereon) to the person or persons who would have been entitled to such amounts if there had been no order.

(iv) Any determination that an order is a qualified domestic relations order which is made after the close of the 18-month period described in clause (v) shall be applied prospectively only.

(v) For purposes of this subparagraph, the 18-month period described in this clause is the 18-month period beginning with the date on which the first payment

would be required to be made under the domestic relations order.

29 U.S.C. § 1056(d)(3)(H).

Subparagraph (H) contains several provisions that demonstrate that the structure of ERISA specifically contemplates that the identity of the individual entitled to benefits may not be certain until after the initial payout of benefits begins. First, the very subject matter of subparagraph (H) itself is concerned with actions the pension plan must perform during a period in which it is being determined who is entitled to receive benefits. During this time period, the pension plan is required to segregate benefits during the first eighteen months that such benefits would be payable if a DRO is ultimately determined to be a QDRO. 29 U.S.C. § 1056(d)(3)(H)(i) and (v). "This benefit-segregation requirement obviously assumes that benefits may already be payable during the period the plan is determining whether the DRO is a QDRO." *Directors Guild*, 234 F.3d at 422.

Second, "Congress expressly contemplated that further state court proceedings might ensue during the 18–month QDRO-determination period[,]" *id.*, because 29 U.S.C. § 1056(d)(3)(H)(i) expressly provides for the possibility that the issue whether a DRO is a QDRO might have to be determined "by a court of competent jurisdiction" during this period. Moreover, because one would ordinarily expect a plan to be able to decide whether a DRO qualifies as a QDRO in a period of time far less than eighteen months, "the evident purpose of the 18–month period was to provide a time in which any defect in the original DRO could be cured" by a state court. *Directors Guild*, 234 F.3d at 422. For this reason, the statute provides that the ex-spouse or alternate payee is entitled to receive the segregated amounts set aside during the initial eighteen month period if he or she presents the plan with a DRO, "or modification thereof[,]" determined to be a QDRO. 29 U.S.C. § 1056(d)(3)(H)(iii); *see also Directors Guild*, 234 F.3d at 422.

Third, "the statute also provides with particularity the circumstances in which the putative alternate payee loses the right to hold up payment of benefits to the participant or

his [or her] designated beneficiary." *Directors Guild*, 234 F.3d at 422. The statute requires that the segregated amounts be paid to the "default" beneficiary (such as a current spouse) if the DRO's status is still in doubt after eighteen months. 29 U.S.C. § 1056(d)(3)(H)(iii)(II). The statute cannot provide for the "loss" of the alternate payee's right to hold up payment of benefits if it did not contemplate the alternate payee's right to do so in the first place.

Finally, the statute expressly provides that "any determination that an order is a qualified domestic relations order which is made after the close of the 18–month period ... shall be applied *prospectively only*." 29 U.S.C. § 1056(d)(3)(H)(iv) (emphasis added). By so doing, ERISA contemplates that such an order might change the identity of the beneficiary. Accordingly, the provisions of ERISA specifically permit a state court to order payment of pension benefits to an alternate payee such as an ex-spouse after the initial payout of benefits has begun.

The foregoing provisions, in our view, as with the specificity and substantive requirements needed to qualify a DRO as a QDRO, effectuate the goal of ERISA to provide certainty for pension plan administrators concerning their obligations. Rather than having to factor in continued uncertainty over which beneficiary to pay and over the amounts payable, 29 U.S.C. § 1056(d)(3)(H) provides plan administrators with a bright line (the eighteen-month time period) to guide them in administering benefits. The provision is decidedly *not* concerned with identifying *who*, among competing claimants, is entitled to the benefits under state law.

In support of her contention that ERISA requires the vesting of benefits with her at Alfred's retirement, Louan relies primarily upon *Hopkins v. AT & T Global Information Solutions Co.*, 105 F.3d 153 (4th Cir.1997), *Rivers v. Central and South West Corp.*, 186 F.3d 681 (5th Cir.1999), and *Samaroo. Rivers* relied solely on the rationale in *Hopkins* without analysis. *See Rivers*, 186 F.3d at 683–84. *Samaroo*, which appears to rely secondarily on *Hopkins, see Samaroo*, 193 F.3d at 190, is a case in which the belatedly-entered DRO conflicted with one of the sub-

stantive requirements to create a QDRO and will be discussed *infra*. In addition, the New Jersey appellate court in *Ross* stated, subsequent to *Hopkins*, that "[n]o federal case has allowed a QDRO to be entered after a participant's death." *Ross*, 705 A.2d at 797. Because *Hopkins* appears to have been somewhat influential with other courts, we will review its analysis in detail.

Paul and Vera Hopkins were divorced in 1986 following a twenty-six-year marriage. *Hopkins*, 105 F.3d at 154. Although Paul's pension was deemed a marital asset, the divorce decree did not award Vera a portion of Paul's pension; instead, Paul was ordered to pay alimony. *Id.* After the divorce, Paul married Sherry, to whom he apparently remained married at the time of the appellate court's decision. *Id.* To collect the alimony, Vera obtained a judgment allowing her to attach Paul's wages. *Id.* This collection method apparently worked well initially but lost its effectiveness when Paul retired in 1993. *Id.*

At his retirement, Paul and Sherry received his pension benefits as a QJ & SA, a form of benefit that, as discussed earlier, permitted Paul to receive a fixed income for life and Sherry to receive at least 50% of that income if Paul died before her. *See id.* at 154–55. After Paul began receiving retirement benefits, Vera obtained a judgment in state court against him for past-due alimony and sought to qualify the state court's DRO as a QDRO in order to collect the money out of the proceeds of Paul's pension benefits. *Id.* at 155. The state court subsequently divided the DRO into two orders, the first ordering payments to Vera from the pension benefits (pension order) and the second ordering payments to Vera from Sherry's surviving spouse benefits (surviving spouse order). *Id.* The pension plan conceded that the pension order was a valid QDRO, but maintained that the surviving spouse order was not a valid QDRO because the benefits had already vested in Sherry when Paul retired. *Id.* The United States Court of Appeals for the Fourth Circuit agreed. *See id.* at 157. In so doing, the court offered the following rationale, which, for the reasons discussed herein, we do not find to be persuasive.

First, the court in *Hopkins* looked to the definition of a QDRO. As noted earlier, 29 U.S.C. § 1056(d)(3)(B)(i) states:

(B) For purposes of this paragraph—

(i) the term "qualified domestic relations order" means a domestic relations order—

(I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable *with respect to a participant* under a plan, and

(II) with respect to which the requirements of subparagraphs (C) and (D) are met[.]

(Emphasis added.) Focusing on the phrase "with respect to a participant[,]" the court reasoned that, because Sherry was a "beneficiary" and not a "participant," the DRO obtained by Vera could not be enforced against Sherry's interests. *See Hopkins*, 105 F.3d at 156–57. The court apparently viewed this as evidence that the surviving spouse benefits vested in Sherry when Paul retired.

█ In our view, however, the court misread the statute by failing to give effect to the words "with respect[.]" If Congress had wanted to limit the effect of a QDRO to benefits designated only for participants, the statute plainly would have defined a QDRO as a DRO that "assigns to an alternate payee the right to[ ] receive all or a portion of the benefits payable *to* a participant under a plan[ .]" Congress did not write the statute in this manner. "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (internal quotation marks and citations omitted). " 'Benefits payable *with respect to* a participant' are, quite evidently, different from 'benefits payable *to* a participant.' " *Directors Guild*, 234 F.3d at 423. This understanding is confirmed by ERISA's definition of the term "participant":

The term "participant" means any employee or former employee of an employer, or any member or former member of an

employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, *or whose beneficiaries may be eligible to receive any such benefit.*

29 U.S.C. § 1002(7) (emphasis added). Because a participant is any present or former employee or union member whose eligibility for benefits may trigger the eligibility of beneficiaries, those beneficiaries can reasonably be said to receive their benefits "with respect to" the participant. *Directors Guild,* 234 F.3d at 424; *see also Dorn,* 211 F.3d at 943 n. 11 ("Use of the phrase 'with respect to' makes clear that alienability under a QDRO is not limited to those benefits that are 'payable to' a participant, *i.e.,* only the participant's life annuity, but may also make other plan benefits, such as the surviving spouse's annuity available to an alternate payee."). Accordingly, the phrase "benefits payable with respect to a participant" does not provide support for the conclusion in *Hopkins* that ERISA forbids alienation of benefits from the present spouse after the date of a participant's retirement.

The court in *Hopkins* also pointed out that, following ERISA's enactment in 1974, regulations provided that surviving spouse benefits were payable only if the surviving spouse was married to the participant both on the date of the participant's retirement and on the date of the participant's death. *See Hopkins,* 105 F.3d at 156 (citing 26 C.F.R. § 1.401(a)–11(d)(3)(i), (ii), (iii) (1977)); *see also* ERISA (1974) § 205(d), 88 Stat. 863 (effectively requiring a participant and spouse to have been married for at least a one-year period ending on the date of the participant's death in order for the spouse to collect surviving spouse benefits). However, following enactment of the REA in 1984, surviving spouse benefits may be paid to a spouse who was married to a participant on the date of the participant's retirement, regardless of whether that spouse is married to the participant on the date of the participant's death. *See* REA (1984) § 205(f), 98 Stat. 1432, (now codified at § 29 U.S.C. § 1055(f)). The court in *Hopkins* found this change to be significant, reasoning that "the

change in ERISA's marriage requirement [brought on by the REA] is evidence that the [s]urviving [s]pouse [b]enefits vest in the spouse married to the participant on the date of retirement." *Hopkins,* 105 F.3d at 156.

The above statement, however, does not provide very strong evidence of the proposition it seeks to support. In contrast, there is a far more compelling explanation for the aforementioned change in the marriage requirement: it was necessary to implement the REA's goal of ensuring that former spouses are not "cut off" from retirement benefits. As long as ERISA continued to require that a surviving spouse be married to the participant at the time of the participant's death, ex-spouses would not be able to receive any such benefits. Termination of the marriage-at-death requirement eliminated this problem. Thus, we do not find the change in ERISA's marriage requirement to be persuasive authority for the proposition that benefits vest in the current spouse at the time of the participant's requirement.

Similarly, the court in *Hopkins* also found it to be significant that the REA made it more difficult to replace a joint and survivor annuity with another form of benefit. *See Hopkins,* 105 F.3d at 156–57. Originally, ERISA required that pension plans offer the participant an opportunity to waive his or her right to receive a QJ & SA in favor of some other form of benefit within a "reasonable period" before the annuity starting date, as defined by regulations to be promulgated by the Secretary of the Treasury. ERISA (1974) § 205(e), 88 Stat. 863. Following adoption of the REA, a participant can only waive this right during the ninety-day period prior to retirement and can only do so with the written consent of the participant's current spouse. *See* REA (1984) §§ 205(c)(2)(A) and 205(c)(6)(A), 98 Stat. 1430–31 (subsequently codified at 29 U.S.C. §§ 1055(c)(2)(A) and 1055(c)(7)(A)). The court reasoned that these changes, which provided more protection to current spouses, were "further evidence that the participant's spouse at the time of retirement has a vested interest in the [s]urviving [s]pouse benefits." *See Hopkins,* 105 F.3d at 157.

█ Again, the court's rationale provides, at best, weak evidence in support of the foregoing conclusion. The REA also amended ERISA's waiver provision to require the spouse's consent be in writing and the spouse's signature be witnessed by a plan representative or notary public. REA (1984) § 206(c)(2)(A) (now codified, with minor changes, at 29 U.S.C. § 1055(c)(2)(A)). The evident purpose of this provision is to: (1) protect *spouses* in general (note that some current spouses will become ex-spouses); and (2) protect pension plans against the subsequent claims of spouses by providing a definitive procedure to verify that they have, in fact, waived their entitlement to certain pension benefits. Furthermore, the REA provides that "[a]ny consent by a spouse [for waiver of the QJ & SA or QPRA] shall be effective *only with respect to such spouse.*" 29 U.S.C. § 1055(c)(2) (emphasis added). Because ERISA provides that a QDRO may require a former spouse to be treated "as a surviving spouse for purposes of section 1055[,]" 29 U.S.C. § 1056(d)(3)(F)(i), the fact that a current spouse has waived the right to a QJ & SA or QPRA does not necessarily mean that a former spouse has waived his or her right to do so. Consequently, contrary to the reasoning in *Hopkins,* it cannot be said that the REA's changes to ERISA's waiver provisions provide significant support for the proposition that benefits vest in a current spouse.

Finally, the court in *Hopkins* reasoned that vesting surviving spouse benefits in the participant's current spouse on the day the participant retires "balances the competing interests of the former and current spouses" inasmuch as "[a] former spouse's interest in the [s]urviving [s]pouse [b]enefits can be protected simply by obtaining a QDRO before the participant retires." *Hopkins,* 105 F.3d at 157. We do not find this rationale persuasive because, as discussed earlier, nothing in ERISA suggests that the law is concerned with "balancing" the competing interests of current and former spouses. Instead, ERISA leaves this task to state domestic relations law as long as the law does not interfere with the administration of pension plans.

Based on the foregoing, we do not find the conclusion in *Hopkins* that surviving spouse benefits vest in the participant's current spouse at the time of retirement to be persuasive. Accordingly, we decline to follow the rationale of *Hopkins* and hold that surviving spouse benefits did not vest in Louan upon Alfred's eligible retirement date of December 1, 1997.

## 2. Vesting of Benefits in Current Spouse upon Death of Participant

█ Louan also relies on *Samaroo* to support her contention that surviving spouse benefits vested in her when Alfred died. In *Samaroo,* the participant, Winston, and his ex-spouse, Louise, were divorced in 1984. *Samaroo,* 193 F.3d at 186. The divorce decree provided Louise with a right to receive a portion of Winston's pension benefits when Winston began to receive them, but did not expressly provide that Louise should receive survivor benefits. *See id.* at 187. Winston died three years later while still actively employed and without having remarried. *See id.* at 187–88. As a consequence, there were no survivor benefits payable to anyone at the time of Winston's death. *See id.* at 188. When the pension plan refused to provide Louise with survivor benefits because they were not expressly mentioned in the divorce decree, Louise returned to state court and had the decree amended *nunc pro tunc* to expressly provide for these benefits. *See id.* at 187–88. After Louise joined the pension plan as a defendant and apparently sought to enforce the amended decree as a QDRO, the plan removed the case to federal court. *See id.* at 187–88.

Relying primarily on the substantive requirements of 29 U.S.C. § 1056(d)(3)(D)(ii), the United States Court of Appeals for the Third Circuit held that the amended decree was not a valid QDRO because it required the pension plan to pay "increased benefits" beyond those that the plan was obligated to pay upon Winston's death. *See Samaroo,* 193 F.3d at 189–91. The court reasoned that

successful operation of a defined benefit plan requires that the plan's liabilities be ascertainable as of particular dates. The annuity provisions of a defined benefit plan

are a sort of insurance, based on actuarial calculations predicting the future demands on the plan. Some annuity participants will die without ever receiving a payment and some participants will receive payments far in excess of the value of their contributions. The fact that some participants die without a surviving spouse to qualify for benefits is not an unfair forfeiture, as [Louise] contends, but rather part of the ordinary workings of an insurance plan. Allowing the insured to change the operative facts after he has lost the gamble would wreak actuarial havoc on administration of the Plan.

*Id.* at 190. Consequently, the holding of *Samaroo* may be consistent with the goal of ERISA's QDRO provisions: to enable pension plan administrators to predict their obligations and, thus, to protect the actuarial soundness of pension plans. *Samaroo* suggests that a determination whether a belated DRO requires the payment of "increased benefits" is made by comparing the benefits payable pursuant to the DRO with the benefits that a plan would have had to pay on either the earlier of the participants's retirement or death.[16]

Although *Samaroo* may be consistent with our interpretation of ERISA, it does not provide support for Louan's position in this case. Louan does not argue that the family court's DRO required the Fund to pay "increased benefits" beyond those it would have been expected to pay on January 17, 1998,

the date of Alfred's death. Nor does the record contain any evidence demonstrating that the DRO required the Fund to pay "increased benefits" in comparison to its obligations on this date.[17] Accordingly, we hold that the rationale of *Samaroo* is not applicable to this case and that the rights to surviving spouse benefits did not vest in Louan upon Alfred's death.[18]

F. *Whether the Amended Decree Interferes with Louan's Entitlement to the "Segregated Amounts" under 29 U.S.C. § 1056(d)(3)(H)*

■ Louan also contends that the family court's DRO interferes with her entitlement to the "segregated amounts" payable to her pursuant to 29 U.S.C. § 1056(d)(3)(H). *See supra* at 417, 60 P.3d at 818. The relevant portion of subparagraph (H) states:

> (iii) If within the 18 month period described in clause (v)—
>
> > (I) it is determined that the order is not a qualified domestic relations order, or
> >
> > (II) the issue as to whether such order is a qualified domestic relations order is not resolved,
>
> then the plan administrator shall pay the segregated amounts (including any interest thereon) to the person or persons who would have been entitled to such amounts if there had been no order.

---

**16.** *Directors Guild*, on the other hand, appears to frame the issue differently. As previously indicated, the reasoning in *Directors Guild* is that an initial DRO creates an "interest" that places a pension plan on notice of a potential future obligation. By implication, an initial DRO allows a plan to project its potential obligation and, therefore, does not require the payment of "increased benefits" in contravention of 29 U.S.C. § 1056(d)(3)(D)(ii). Under the reasoning of *Directors Guild*, it would appear that a belated QDRO could require a plan to pay greater monthly benefits than the amount that would have been payable upon the earlier of the participant's death or retirement, as long as the plan was effectively served with "notice" of the potential "interest" by receipt of an earlier DRO.

Additionally, in *Patton*, the United States District Court for the District of Colorado agreed with the dissent in *Samaroo* that a pension plan is not forced to pay "increased benefits" when a

state court order is issued *nunc pro tunc* to a point in time before the participant's death because, under state law, the order is retroactive to that time, and federal courts are obligated to give effect to state court orders pursuant to the Full Faith and Credit Act, 28 U.S.C. § 1738 (2000). *Patton*, 179 F.Supp.2d at 1236–37.

As will be seen, it is not necessary to resolve the competing interpretations of *Directors Guild* or *Patton* and *Samaroo* in this case.

**17.** The record is also devoid of any indication that the Fund was required to pay "increased benefits" in comparison to its obligation on December 1, 1997, the date of Alfred's eligibility for retirement.

**18.** In *Hogan v. Raytheon, Co.*, 302 F.3d 854 (8th Cir.2002), the United States Court of Appeals for the Eighth Circuit similarly held that a DRO may be qualified posthumously.

(iv) Any determination that an order is a qualified domestic relations order which is made after the close of the 18–month period described in clause (v) *shall be applied prospectively only.*

(v) For purposes of this subparagraph, the 18–month period described in this clause is the 18–month period beginning with the date on which the first payment would be required to be made under the domestic relations order.

(Emphasis added.) In this case, the November 17, 1999 DRO provides that Margot should receive benefits as a QPRSA beginning February 1, 1998, which is when the "18–month period" described in clause (v) begins to run. Therefore, pursuant to clause (iv), any determination by the Fund that the amended DRO is a QDRO made after August 1, 1999—eighteen months from February 1, 1998—can have prospective effect only. Accordingly, because the family court's DRO itself was not entered until November 17, 1999, any subsequent determination by the Fund that the DRO is a QDRO can have prospective effect only as of the date of such subsequent determination. Consequently, notwithstanding the language of the DRO, under ERISA, the Fund is only obligated to pay the amounts ordered by the DRO to Margot as of the date that it qualified the DRO.

Louan submits that, pursuant to 29 U.S.C. § 1056(d)(3)(H)(iii)(II), the Fund is required to pay any segregated amounts attributable to the period before it qualified the DRO to her. Louan is correct. However, we do not believe that this conclusion mandates that the DRO be vacated because it interferes with Louan's right to the segregated amounts. It simply means that, because the amended DRO was entered after August 1, 1999, under ERISA, its "qualification" as a QDRO is enforceable only "prospectively." In other words, federal law preempts the amended DRO to the extent that the DRO's language suggests that benefits can be paid to Margot retroactive to February 1, 1998. ERISA mandates no more than this "prospective" requirement. In all other respects, the DRO is enforceable. Therefore, although *we* agree with Louan that she is entitled to the aforementioned "segregated amounts," we disagree that the amended DRO interferes with her rights under ERISA. As long as the DRO is given prospective effect only as of the date it is qualified by the Fund, Louan will receive exactly what she is entitled to under ERISA. Accordingly, we hold that the family court's amended DRO does not interfere with Louan's right to the "segregated amounts" payable to her pursuant to 29 U.S.C. § 1056(d)(3)(H).[19]

## IV. *CONCLUSION*

Based on the foregoing, we hold that: (1) this court has jurisdiction in this case because Louan's notice of appeal was timely filed; (2) Louan is estopped from claiming that she was not a proper party to this case for the purpose of defending her claim to

---

19. In its amicus brief, the Fund suggests that the application of 29 U.S.C. § 1056(d)(3)(H) is more difficult in practice than in theory. The Fund appears to seek guidance as to which dollar amount, and to whom, it owes the benefits attributable to the time period before it apparently qualified the DRO. Because of the unusual circumstances of this case, the Fund is correct as to the difficulty of implementing the law because the dollar amount of monthly benefits payable under the 100% Contingent Annuitant Option chosen by Louan is likely to be different from the dollar amount of monthly benefits payable as a QPRSA to Margot. This issue, however, is not properly before this court. It bears repeating that the federal issue in this case is limited to whether the family court erred in entering a DRO that interfered with Louan's vested rights or Louan's rights to certain segregated monies pursuant to 29 U.S.C. § 1056(d)(3)(H). As indicated above, the family court did not err. The interpretation of the law by which we have reached this conclusion, however, suggests that the Fund should pay to Louan either: (1)(a) the benefits attributable to the 100% Contingent Annuitant Option from the period November 1, 1997 through November 17, 1999, plus (b) the benefits attributable to the monthly benefits that would have been payable to Margot as specified in the DRO from November 18, 1997 until the date of the Fund's qualification of the DRO, plus (c) interest; or (2)(a) the benefits attributable to the 100% Contingent Annuitant Option from the period November 1, 1997 through January 31, 1998, plus (b) the benefits attributable to the monthly benefits that would have been payable to Margot as specified in the DRO from February 1, 1998 until the date of the Fund's qualification of the DRO, plus (c) interest; or (3)(a) the 100% Contingent Annuitant Option from the period November 1, 1997 until the date of the Fund's qualification of the DRO, plus (b) interest.

survivor's benefits from the Fund; (3) although the family court's finding of fact concerning the date that Margot received notice from the Fund that the decree did not meet the requirements of a QDRO is clearly erroneous, such was not reversible error; (4) neither (a) the language of the 1989 divorce decree, nor (b) Hawai'i Revised Statutes § 580–56, deprived the family court of jurisdiction to amend the decree; (5) the family court's November 17, 1999 DRO amending the initial decree did not interfere with Louan's vested rights under the Employee Retirement Income Security Act (ERISA), because she had none; and (6) the family court's November 17, 1999 DRO does not interfere with Louan's rights to pension benefits payable before the date that the Fund qualifies the DRO. Accordingly, because, under ERISA, the DRO can have prospective effect only, we affirm the family court's November 17, 1999 order amending the initial divorce decree and its December 17, 1999 order denying Louan's motion for reconsideration.

Dissenting Opinion by ACOBA, J., in which RAMIL, J., joins.

The majority awards Appellant Louan Torres (Louan) a portion of the pension benefits accrued by her late husband, Alfred Torres, Jr., (Alfred) under a pension plan known as the Operating Engineers Retirement Plan (the Plan) in which he was the participant, even though the majority upholds the entry of an order, which if determined to be a qualified domestic relations order (QDRO) as defined under § 414(p) of the Internal Revenue Code of 1986 (the Code), *see* 26 U.S.C. § 1 (2002), et seq., and § 206(d) of the Employee Retirement Income Security Act of 1974 (ERISA), *see* 29 U.S.C. § 1001 (2002), et seq.,[1] would assign any rights to Alfred's benefits to Alfred's former spouse, Appellee Margot Torres (Margot), and not Louan. While I believe that the order granting Margot's motion for entry of an amended QDRO by the family court of the first circuit (the court) was within the court's jurisdiction, I dissent from the majority's characterization of the QDRO and its resulting conclusion that the Plan is required to pay Louan benefits. Because this opinion is published and, thus, establishes precedent in our jurisdiction, *see* Appendix A attached hereto, the rules of law involved extend beyond this case alone.

I.

Margot and Alfred were married in 1967 and divorced on January 10, 1989. The divorce decree[2] (the decree) was submitted to

---

1. For consistency, hereinafter all cites to the Code and the ERISA statute refer to the United States Code.

2. Certain provisions in the 1989 divorce decree are relevant. They provide as follows:

 a. Defendant's [ (Alfred, Jr.) ] Retirement. Plaintiff [ (Margot) ] is awarded a share of retirement under Defendant's Operating Engineers' Retirement Plan if, as, and when Defendant commences to receive the same. The share which [Margot] is awarded shall be computed according to the following formula:

$$\frac{1}{2} \times \frac{19 \text{ years in plan}}{\text{total years in plan at retirement}} \times \text{Defendant's monthly gross retirement} = \text{[Margot]'s share}$$

 For the purpose of this allocation of [Margot]'s interest, Defendant is the "Participant" in the aforementioned plan and [Margot] is the Alternate Payee (up to the percentage specified above) under the aforementioned Plan within the meaning of the Retirement Equity Act of 1984. The share awarded and assigned to the Alternate Payee from the aforementioned Plan shall be paid to the Alternate Payee if, as, and when Participant commences to receive retirement benefits from the Plan. Said payment, at the option of the Alternate Payee, may be paid to the Alternate Payee directly or transferred from the aforementioned Plan to a financial institution or other third party as directed by Alternate Payee in writing to said Plan.
 Defendant's name, current address and Social Security No. are:

the Plan as a domestic relations order (DRO) for QDRO determination. The decree indicates the court retains jurisdiction over the "retirement interest" of Alfred that was awarded to Margot "after either party's death" with authority "to make any just and equitable order not inconsistent with any" provisions of the decree.

The Plan acknowledged receipt of the decree on March 1, 1989. On September 8, 1997, the Plan apparently wrote a letter to Margot and Alfred, indicating that the 1989 divorce decree did not qualify as a QDRO. The Plan determined that the 1989 decree was not a QDRO because, among other things, the decree failed to account for survivor benefits and did not specify how long benefits were to be paid to Margot. In the same correspondence, the Plan also advised that it might be required to pay out the benefits to the person who might otherwise be entitled to them, if the DRO was not qualified as a QDRO within the eighteen-month period specified in the ERISA law.

Alfred applied to the Plan for pension benefits to be effective on December 1, 1997. He passed away on January 17, 1998, before completing his benefit papers. At the time of death, Alfred was married to Louan.

The court found that Margot did not receive a copy of the Plan's September 8, 1997 letter until June 1, 1998. On September 1, 1998, Margot's counsel apparently submitted a document denominated as the First Amended QDRO to the Plan. On February 28, 1999, the Plan's counsel responded to Margot's September 1, 1998 correspondence with suggested changes to be made to that First Amended QDRO. The suggested changes were made and a copy was sent to the attorney for Louan on March 1, 1999.

Up until June 1999, Margot and Louan apparently attempted to settle the dispute over Alfred's benefits. On June 23, 1999, Margot filed the motion which is the subject of this appeal, seeking an order for a QDRO, or to compel Louan, as Alfred's Successor–In–Interest, to execute the QDRO. Margot attached to her motion a Proposed "First Amended QDRO." The motion was heard on September 3, 1999, and Louan was represented by counsel.

The court found *inter alia* that, "[b]ut for the deceased [ (Alfred's) ] death, the Plan would have commenced paying [Alfred] pension benefits as soon as all paperwork had been completed, and those payments would have been made retroactive to December 1, 1997, the date Defendant became entitled to begin receiving the benefits."

In light of its findings, the court concluded that (1) the court had jurisdiction to enter an "amended" QDRO, (2) Margot was entitled under the QDRO to be treated as if she were Alfred's surviving spouse for purposes of the qualified joint and survivor annuity and/or qualified preretirement survivor annuity, as set forth in ERISA, 29 U.S.C. § 1005, and (3) Alfred's widow, Louan, had no interest in the benefits awarded to Margot. The court indicated it would enter orders granting Margot's motion (1) for entry of a QDRO and approving the proposed QDRO submitted and (2) to compel Louan to execute the first amended QDRO, and subsequently did so.

Pursuant to its findings and conclusions, the court entered the "First Amended [QDRO]" (the 1999 Order). It provides as follows:

> [ALFRED] . . . .
> Plaintiff's (Alternate Payee's) name, current address and social security No. are: [MARGOT] . . . .
> This Order is applicable to the Pension Trust Plan Operating Engineers' Retirement Plan, presently administered by the Pension Trust Plan Operating Engineers, 642 Harrison Street, San Francisco, California 94107.
> The Court shall retain jurisdiction over the retirement interest described herein for as long as the parties both shall live and after either party's death.
> The Court shall also have the authority to make every just and equitable order not inconsistent with any of the provisions herein.

(Emphases added.)

WHEREAS, [ALFRED, JR.] (the "Participant") and [MARGOT] (the "Alternate Payee"), . . . executed the [Divorce] Decree . . . filed herein on January 10, 1989; and

WHEREAS, said Divorce Decree provided for the division of the Marital Assets between the Participant and the Alternate Payee; and

WHEREAS, pursuant to the said Divorce Decree, this [QDRO] provides for the division and disposition of the benefits due to Participant under the Operating Engineers' Retirement Plan and grants the Alternate Payee rights to such benefits on the terms set forth in this QDRO;

WHEREAS, said Divorce Decree provided that the Court shall retain jurisdiction over the retirement interest described therein for as long as the parties both shall live and after either party's death;

WHEREAS, Defendant is deceased, having died on January 17, 1998;

*WHEREAS, this Order is intended to be a QDRO as defined in Section 414(p) of the Internal Revenue Code of 1986, as amended, and the Retirement Equity Act of 1984 (H.R.4280);*

*NOW, THEREFORE, IT IS HEREBY ADJUDGED, DECREED AND ORDERED that the Alternate Payee will receive payments from the Participant's retirement plan named below, pursuant to the court's assignment of benefits to Alternate Payee by the order herein below, in compliance with Sections 401(a)(13) and 414(p) of the Internal Revenue Code of 1986, as amended, as follows:*

1. *Definitions:*

(a) The term "Participant" shall mean [ALFRED, JR.], who is now deceased and whose last known address, social security number and date of birth were as follows:

. . . .

[ALFRED JR.] is survived by his spouse, [LOUAN,] who is ALFRED TORRES' survivor-in-interest.

(b) The term "Alternate Payee" shall mean [MARGOT], whose current address, social security number and date of birth are as follows:

. . . .

(c) The term "Plan" shall mean the Pension Plan maintained by the Pension Trust Plan for Operating Engineers. The Plan Administrator is the Board of Trustees of the Pension Trust Plan for Operating Engineers located at . . . .

2. The Alternate Payee and this Court intend this Order to be a [QDRO] as defined in Section 401(a)(13) and 414(p) of the Internal Revenue Code of 1986, as amended, and the Retirement Equity Act of 1984, as amended. Accordingly, *the Alternate Payee is granted a portion of benefits from the Plan, thereby entitling the Alternate Payee to receive a portion of benefits equal to a percentage of the Participant's Plan benefits as determined by paragraph 3 hereinbelow,* and as provided for in this QDRO.

Furthermore, this QDRO shall not require the Plan to provide increased benefits (determined on the basis of actuarial value) and not require the Plan to provide benefits to the Alternate Payee which are required to be paid to another alternate payee under another order previously determined to be a [QDRO].

3. *That portion of the Participant's total, unadjusted monthly pension benefit accrued in the Plan between the date of marriage (September 30, 1967) and the date of divorce (January 10, 1989) constitutes the marital property of Participant and Alternate Payee. In disposing of this marital property asset, Alternate Payee hereby is awarded as her separate property one-half of that marital property portion.*

4. *Alternate Payee shall be treated as if she were Participant's surviving spouse with respect to the marital property portion of his accrued pension benefits for the purpose of the 50% pre-retirement surviving spouse benefit provided under the Plan. Accordingly, she shall receive her one-half marital property share as a 50% pre-retirement surviving spouse benefit payable to her from February 1, 1998, as long as she shall live.* No other benefit shall remain payable from that portion of the Participant's total accrued pension

benefits accrued during his marriage to Alternate Payee.

5. If Participant or his beneficiary or surviving spouse is awarded a post-retirement benefit increase calculated based on the amount of benefits accrued, Alternate Payee shall share pro rata in any post-retirement.

6. This assignment of benefits does not require the Plan to provide any type or form of benefit or any option not otherwise provided under the Plan. Notwithstanding any provision to the contrary, the Participant may select to receive his accrued benefits under the Plan in whatever form he chooses, provided that the Participant selects a form that is permitted by the Plan.

7. During the effective term of the QDRO, the Alternate Payee shall be solely responsible for notifying and informing the Plan Administrator of the Plan as to any changes of her residential address.

8. *This QDRO is issued pursuant to 581–47 of the Hawai'i Revised Statutes, as amended, which provides for the division of marital property rights, as defined therein between spouses and former spouses in actions for divorce.*

9. *The intent of this QDRO is to provide the Alternate Payee with a retirement payment that fairly represents her marital share of the retirement benefits as defined in paragraph 3 hereinabove.* If any Order submitted to the Plan Administrator of the Plan is held not to be a [QDRO] within the meaning of Section 414(p) of the Internal Revenue Code of 1986, as amended, the parties agree to request a court of competent jurisdiction to modify the Order to make it a [QDRO], which reflects the parties' intent, said modification Order to be entered *nunc pro tunc*, if appropriate.

. . . .

11. The Court shall have continuing jurisdiction to make every order reasonably necessary to implement and accomplish the direct payment to Alternate Payee by the Plan Administrator of the Plan of her percentage share of Participant's gross retirement pay, including the right to advise the Plan Administrator of the precise amount of Participant's gross retired pay that is payable to Alternate Payee.

12. *There are no prior conflicting court orders and no previous agreements providing any benefits under the Plan to a different spouse or different former spouse of the Employee.*

13. A certified copy of this Order shall be served upon the Plan Administrator forthwith. *This Order shall take effect immediately. Any amendment or modification of this Order to qualify this order as a [QDRO] shall be retroactive to the date of the parties divorce, January 10, 1989.*

(Emphases added.) The court issued a copy of the 1999 "QDRO" to the Plan.

As represented in its amicus brief, on February 23, 2000, the Plan apparently notified Margot and Louan that it had accepted the November 17, 1999 Amended DRO as qualifying for QDRO status. The Plan has indicated that, to date, none of Alfred's benefits have been disbursed to anyone, including Louan. Also, as stated in Louan's answering brief, Louan has appealed that determination to the Plan's Board of Trustees (Board). The Board has not yet made its decision.

## II.

On appeal, Louan maintains that the court erred because: (1) neither Louan nor Alfred's estate are parties to this action even though their rights are affected; (2) the court did not have jurisdiction to determine the rights to Alfred's pension benefits; (3) the court could not enter a posthumous QDRO, since it would interfere with Louan's vested interest in the survivor benefits arising from Alfred's pension and in "segregated amounts" under the ERISA provisions; and (4) there is no competent evidence to support the contention that Margot did not receive a copy of the Plan's September 8, 1997 notice that the DRO did not constitute a QDRO. The Plan did not appear as a party to this case, however, it filed an amicus brief, taking the position that Margot is entitled to the survivor benefits granted under the 1999 Order if the order is valid under our domestic relations law.

## III.

The court had jurisdiction of this case and had authority to award survivor benefits to Margot. *See* majority opinion at 410–411, 60 P.3d at 811–813. Here, under Hawai'i Revised Statutes (HRS) § 580–47 (1993), the court had an equitable basis for making the award and was not precluded from doing so by HRS § 580–56 (1993). The court concluded that Margot "shall be treated as if she [was Alfred's] surviving spouse with respect to the marital property portion of his accrued pension benefits[.]" We review the family court's conclusion to award benefits under a manifest abuse of discretion standard. *See Carroll v. Nagatori–Carroll,* 90 Hawai'i 376, 381, 978 P.2d 814, 819 (1999) ("Under the abuse of discretion standard of review, the appellate court is not authorized to disturb the family court's decision unless (1) the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant; (2) the family court failed to exercise its equitable discretion; or (3) the family court's decision clearly exceeds the bounds of reason." (Brackets and quotation marks omitted.)).

The court noted that "[t]he intent of this QDRO is to provide [Margot] with a retirement payment that fairly represents her marital share of the retirement benefits[.]" It was within reason to conclude that the right to survivor benefits arose out of the "retirement interest" awarded to Margot because the right to such benefits accrued during Margot's marriage to Alfred. Accordingly, there was no manifest abuse of discretion by the court in exercising its equitable powers to modify the divorce decree, and under the circumstances, the 1999 Order was not inconsistent with the decree.[3]

## IV.

As noted by the Ninth Circuit in *Trustees of the Dirs. Guild of Am.-Producer Pension Benefits Plans v. Tise,* 234 F.3d 415 (9th Cir.2000), the ERISA law was specifically modified by the Retirement Equity Act of 1984(REA) to allow "state court orders issued pursuant to domestic relations proceedings [to] affect the distribution of pension benefits governed by ERISA." *Id.* at 419. *See* 29 U.S.C. § 1056(d)(3)(B)(ii) (A DRO is "any judgment, decree, or order" that "relates to the provisions of child support, alimony payments, or marital rights to a spouse, former spouse, child, or other dependents of a participant" and that "is made pursuant to a State domestic relations law[.]").

As is evident, the 1999 Order is a DRO within the meaning of the ERISA provisions. *See id.* The 1999 Order awards to Margot a share of Alfred's pension benefit that was accrued during their marriage. Also, the Order is issued pursuant to HRS § 580–47,[4]

---

3. It should also be noted that a qualified joint survivor annuity (QJSA) and a qualified preretirement survivor annuity (QPSA) are forms of benefit payment from a pension plan. Generally, a QJSA provides (1) annuity payments during the life of the participant and (2) a survivor annuity equal to at least 50% (and not greater than 100%) of the annuity payments above, during the life of the participant's surviving spouse, which together are the actuarial equivalent of a single annuity for the life of the participant. *See* 26 U.S.C. § 417(b).

 A QPSA, which applies when the participant dies before receiving retirement benefits, and which the court apparently awarded Margot, provides annuity payments at least equal to the survivor annuity payments of the QJSA. Except in certain instances, the QJSA and QPSA must be provided as benefit payment options under all tax-qualified plans subject to section 401(a), including traditional pension plans. *See* 26 U.S.C. § 401(a)(11).

 As noted, survivor benefits, such as a QPSA, arise out of retirement benefits, and, in the case of a QJSA, retirement benefits *include* survivor benefits. The survivor benefits contemplated by the 1999 Order arise out of the Alfred's retirement benefits. Although the record does not state whether the Plan is a tax-qualified plan that requires a QJSA or QPSA, or that the 50% preretirement surviving spouse benefit in the 1999 Order is a QPSA, the parties do not indicate otherwise. Such a survivor annuity awarded to Margot constitutes "retirement benefits" that arise out of Alfred's "retirement interest" awarded to Margot by the decree. Hence, the court's order is not inconsistent with the decree.

4. The 1999 Order incorrectly cites to HRS § 580–47 as "581–47." HRS § 580–47 (Supp. 2001) provides, in pertinent part, as follows:

 (a) Upon granting a divorce, or thereafter if, in addition to the powers granted in subsections (c) and (d), jurisdiction of those matters is reserved under the decree by agreement of both parties or by order of court after finding that good cause exists, the *court may make any*

discussed *supra*, which provides for the division of marital property rights. Because the Order concerns the marital property rights of a former spouse of a pension plan participant and is made pursuant to a state domestic relations law, the Order is a DRO within the meaning of the QDRO provisions. *See Director's Guild*, 234 F.3d at 420 (A DRO is "any order relating 'to the provision of child support, alimony, or marital property rights to a spouse, former spouse, child or other dependent of a plan participant ... made pursuant to a State domestic relations law.'" (Citations omitted.)).

## V.

The court's 1999 Order is designated "First Amended Qualified Domestic Relations Order." The order, however, does not constitute a QDRO unless it meets certain requirements. *See* 29 U.S.C. § 1056(d)(3).[5] Under section 414(p) of the Code and section 206(d)(3) of ERISA, generally a QDRO is an order that recognizes a spouse's, former spouse's, child's, or other dependent's rights to an individual's pension plan benefits, and assigns such rights. *See* 26 U.S.C. § 414(p)(7); 29 U.S.C. § 1056(d)(3); *see also*

> *further orders as shall appear just and equitable* ... (3) finally dividing and distributing the estate of the parties, real, personal, or mixed, whether community, joint, or separate.... In making these further orders, the court shall take into consideration: the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, and all other circumstances of the case ....
> (Emphasis added.)

**5.** 29 U.S.C. § 1056(d)(3), in pertinent part, states:
 (B) For purposes of this paragraph—
 (i) the term "qualified domestic relations order" *means a domestic relations order*—
 (I) which creates or recognizes the existence of *an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan,* and
 (II) with respect to which the requirements of subparagraphs (C) and (D) are met, and
 ....
 (C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies—

*Directors Guild*, 234 F.3d at 420 (A QDRO is a DRO that "creates or recognizes the existence of an alternate payee's right to ... receive all or a part of the benefits payable with respect to a participant under an ERISA plan[.]" (Brackets omitted.)).

## A.

First, in order to qualify as a QDRO, the order must: (1) assign to an alternate payee the right to receive all or a portion of the benefits payable with respect to a participant under a plan; (2) clearly specify the (a) plan, (b) names and last known mailing addresses of the participant and alternate payee, (c) amount of benefits to be awarded to the alternate payee or the manner in which such amount may be calculated, and (d) number or period of payments; (3) not require the plan to provide (a) any type or form of benefits not offered under the plan, (b) increased benefits (on the basis of actuarial value), or (c) benefits to an alternate payee that are required to be paid to another alternate payee under a previous QDRO. *See* 26 U.S.C. § 414(p)(1)(A)(i), (2) and (3); 29 U.S.C. § 1056(d)(4)(B)(i)(I), (C) and (D).

 (i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
 (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,
 (iii) the number of payments or period to which such order applies, and
 (iv) each plan to which such order applies.
 (D) A domestic relations order meets the requirements of this subparagraph only if such order—
 (i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,
 (ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and
 (iii) does not require the payments of benefits to an alternate payee which are required to be paid to another payee under another order previously determined to be a qualified domestic relations order.
 (Emphases added.)

Here, the 1999 Order states that an alternate payee shall receive a portion of the participant's benefits under the Plan; it identifies the Plan as the Pension Plan maintained by the Pension Trust Plan for Operating Engineers; gives the names and addresses of Alfred, as participant, and Margot, as alternate payee; and states the form, manner and amount of payment, including that the alternate payee shall be treated as the surviving spouse and her award shall be in the form of the "50% pre-retirement surviving spouse benefit" provided under the Plan, payable from February 1, 1998. Hence, the 1999 Order would appear to satisfy QDRO requirements.

Furthermore, it appears the court had made a QDRO determination of the 1999 Order. The 1999 Order is designated "First Amended Qualified Domestic Relations Order," it designates itself in the third WHEREAS clause as "this Qualified Domestic Relations Order ("QDRO")," it states in the sixth WHEREAS clause that "this Order is intended to be a QDRO as defined in Section 414(p) of the Internal Revenue Code of 1986," and it states in section 2 that "[t]he Alternate Payee and this Court intend this Order to be a Qualified Domestic Relations Order as defined in Section 401(a)(13) and 414(p) of the Internal Revenue Code of 1986...." [6]

## B.

Second, a QDRO determination of the Order must be performed "by the plan administrator, by a court of competent jurisdiction, or otherwise." 26 U.S.C. § 414(p)(7).[7] Arguably the court, which had the authority to issue an order pursuant to HRS 580–47, *see*

HRS 571–14 (Supp.2001),[8] and implicitly to apply and interpret federal law, is "a court of competent jurisdiction" under the ERISA law. *See In re Marriage of Oddino*, 16 Cal.4th 67, 65 Cal.Rptr.2d 566, 939 P.2d 1266, 1273 (1997) (holding that "Congress extended concurrent state jurisdiction to any action by a participant or beneficiary to obtain or clarify benefits under the terms of a [QDRO] plan"); *see also Jones v. American Airlines, Inc.*, 57 F.Supp.2d 1224, 1232 (D.Wyo.1999) ("It seems highly unlikely Congress, acting to protect the rights of former spouses and dependents as adjudicated in state court, would, at the same time, have deprived them of their existing ability to obtain enforcement of those rights in state court and required them instead to initiate a separate lawsuit in federal court whenever a retirement plan disputed the qualified status of the state court order."); *Board of Trustees of the Laborers Pension Trust Fund for Northern California v. Levingston*, 816 F.Supp. 1496, 1500 (N.D.Cal.1993) ("In light of the specific use of the general term, 'court of competent jurisdiction' in the 1984 amendments, the most likely inference is that Congress presumed that both state and federal courts would be reviewing QDRO determinations.").

Under 29 U.S.C. § 1056(d)(3)(G)(i), then, the plan administrator and a "court of competent jurisdiction[,]" 29 U.S.C. § 1056(d)(3)(H)(i),[9] are authorized to determine whether a DRO meets the requirements of a QDRO. The law does not appear to prohibit a court, which has granted the DRO, such as the family court, from making a QDRO determination with respect to the same order.[10] Moreover, as mentioned previously, Margot represents the Plan has already determined that the DRO is a QDRO.[11]

---

**6.** The only arguably contrary indication to QDRO status is section 13 of the 1999 Order, which indicates that the 1999 Order may require a QDRO determination inasmuch as it provides that "[a]ny amendment of this Order *to qualify this order* as a Qualified Domestic Relations Order shall be retroactive to the date of the parties [sic] divorce, January 10, 1989." (Emphasis added.)

**7.** The majority and the parties seem to believe that only the plan administrator, here, the Plan, is the entity authorized to make a QDRO deter-

mination. The statute clearly states otherwise. *See* 29 U.S.C. § 1056(d)(3)(H)(i).

**8.** HRS § 571–14(a)(3), in relevant part, provides that the family court "shall have exclusive original jurisdiction ... [i]n all proceedings under [HRS] chapter 580[.]"

**9.** *See infra* note 11.

**10.** *See supra* note 9.

**11.** I believe that it is the better practice to submit orders for QDRO determination to the plan ad-

## VI.

Louan argues that Margot's right to obtain a QDRO expired when Alfred passed away. For support, Louan cites *Rivers v. Central and South West Corp.*, 186 F.3d 681, 683 (5th Cir.1999) (concluding that ERISA pension benefits irrevocably vested on the date of the participant's retirement in the second wife, where the first wife had failed to obtain a QDRO prior to the participant's retirement); *Samaroo v. Samaroo*, 193 F.3d 185, 189 (3rd Cir.1999) (holding that divorce decree is not a QDRO where it had effect of increasing plan liability by conferring survivor's benefits on ex-wife after right to those plan benefits had lapsed); *Hopkins v. AT & T Global Information Solutions Co.*, 105 F.3d 153, 156 (4th Cir.1997) (ruling that the surviving spouse ERISA benefits "vest in the participant's current spouse on the date the participant retires").

However, a straightforward reading of the statutory language does not indicate that the right to obtain a QDRO will expire at retirement, death, when benefits become payable or at any other particular time. *See Directors Guild*, 234 F.3d at 421 (indicating that "for all the detail of the QDRO requirements, ERISA nowhere specifies that a QDRO must be in hand before benefits become payable"); *QDROs: The Division of Pensions Through Qualified Domestic Relations Orders* [hereinafter *QDRO Handbook* ] at 20–21 (Q & A 2–13) (2001) (indicating that the procedures set forth in section 414(p)(7)

ministrator which, because of its duties, may have more immediate familiarity with the plan, handling competing claims of this nature, and pension benefits law. *See* U.S.C. § 1056(d)(3)(H)(iv).

**12.** The Secretary of Labor may issue regulations upon consultation with the Secretary of Treasury. *See* 26 U.S.C. § 414(p)(13). In consultation with the Treasury Department, the Department of Labor (DOL) has published the *QDRO Handbook. See id.* at 1 n. 1.

**13.** Section 401(a)(13), in relevant part, provides:
*A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated.*
26 U.S.C. § 401(a)(13) (emphasis added.)

**14.** 26 U.S.C. § 414(p)(7) states in relevant part as follows:

of the Code apply to an "order received on or after the date on which benefits would be payable").[12] Rather, even when a QDRO would be rendered ineffective—such as when a participant's account is fully distributed, there is nothing in the account, and it is no longer accruing benefits—the statutes do not indicate that *the right to obtain* a QDRO has expired.

## VII.

A DRO will not cause a pension plan, subject to section 401(a) of the Code and the anti-alienation provisions, to pay a participant's benefits other than to the participant or a beneficiary, such as Louan, unless that order is determined to be a QDRO. *See* 29 U.S.C. § 1056(d)(3); *see also* 26 U.S.C. § 401(a)(13).[13] In other words, a DRO shall cause the Plan to account separately for the amounts payable to Margot according to the 1999 Order, but to pay such amounts only upon a determination that it is a QDRO. *See* 26 U.S.C. § 414(p)(7)(A); 29 U.S.C. § 1056(d)(3)(H). Because the 1999 Order did constitute a DRO, the Plan was compelled to account separately for amounts that the 1999 Order awarded to Margot, the alternate payee. *See* 26 U.S.C. § 414(p)(7)(A); 29 U.S.C. § 1056(d)(3)(H)(i).

An order that is submitted to a plan for QDRO determination generally will suspend distribution of the segregated amounts for an eighteen-month period pending such a determination.[14] *See* 29 U.S.C. § 1056(d)(3)(H)(v);

(A) In general.—*During any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined* (by the plan administrator, by a court of competent jurisdiction, or otherwise), *the plan administrator shall separately account for the amounts* (hereinafter in this paragraph referred to as the "segregated amounts") *which would have been payable to the alternate payee during such period if the order had been determined to be a qualified domestic relations order.*
(B) Payment to alternate payee if order determined to be qualified domestic relations order.—*If within the 18 month period described in subparagraph (E) the order (or modification thereof) is determined to be a qualified domestic relations order, the plan administrator shall pay the segregated amounts* (including any interest thereon) to the person or persons entitled thereto.

*Director's Guild*, 234 F.3d at 421 ("While the plan is making this determination, it must segregate the benefits that would be due to the alternate payee under the terms of the DRO during the first 18 months that those benefits would be payable if the DRO is ultimately deemed a QDRO."). Orders that are determined to be QDROs after the eighteen-month period are applied to the relevant account prospectively. "Any determination that an order is a qualified domestic relations order which is made after the close of the 18–month period ... shall be applied prospectively only." 29 U.S.C. § 1056(d)(3)(H)(iv); *see also Directors Guild*, 234 F.3d at 422 ("This benefit-segregation requirement obviously assumes that benefits may already be payable during the period the plan is determining whether [an order] is a QDRO.")

In this regard, Louan argues that, once the eighteen-month period following submission of the 1989 decree to the Plan expired, she had an irrevocable vested right in benefits to be paid as "the person ... who would have been entitled to such amounts if there had been no order." [15] 26 U.S.C. § 414(p)(1)(C)(ii). Thus, she reasons, the 1999 Order interfered with that right. It is true that the 1989 divorce decree was submitted to the Plan for QDRO determination and, had an 18–month period expired without

such a determination, any segregated amounts could have been paid out as if there were no order from the court.[16] 26 U.S.C. § 414(p)(7); 29 U.S.C. § 1056(d)(3). Therefore, it is possible that Louan may have been *eligible* for payment of benefits under the plan at one point following Defendant's passing, inasmuch as the Plan apparently segregated the benefits. *See* 29 U.S.C. § 1056(d)(3)(H).

The ERISA law seemingly imposes an obligation on the Plan to pay the benefits to the beneficiary after an eighteen-month period has run, *see supra* note 15. However, the statute says nothing about rights vesting in the beneficiary after eighteen months. *Cf. Ross v. Ross*, 308 N.J.Super. 132, 705 A.2d 784, 796 (1998) (rejecting arguments that benefits *vest* in either the beneficiary's ex-wife or current wife and dividing benefits on other grounds). In this case, as the amicus brief seemingly indicates, the Plan—by rule, discretion, or otherwise—apparently refrained from making payments from the account to anyone, including Louan.

VIII.

On the other hand, once qualified as a QDRO, the 1999 Order took "effect immediately." [17] The 1999 Order is a *different* order

(C) Payment to plan participant in certain cases.—*If within the 18 month period described in subparagraph (E)—*
(i) it is determined that the order is not a qualified domestic relations order, or
(ii) *the issue as to whether such order is a qualified domestic relations order is not resolved, then the plan administrator shall pay the segregated amounts* (including any interest thereon) *to the person or persons who would have been entitled to such amounts if there had been no order.*
(D) Subsequent determination or order to be applied prospectively only.—*Any determination that an order is a qualified domestic relations order* which is *made after the close of the 18–month period* described in subparagraph (E) *shall be applied prospectively* only.
(E) Determination of 18–month period.-For purposes of this paragraph, the 18–month period described in this subparagraph is the 18–month period beginning *with the date on which the first payment would be required to be made under the domestic relations order.*
(Emphases added).

**15.** The concept of vesting and the vesting of benefits provisions are not closely related to the

QDRO provisions. *Compare* IRC § 411 and ERISA § 203 *with* IRC § 414(p) and ERISA § 206(d). Generally, when a participant retires and takes distribution from the plan, he is entitled to only his vested benefits, unvested benefits are forfeited. A QDRO may assign the participant's (or beneficiary's) vested benefits, however, to an alternate payee.

**16.** It is arguable as to when the eighteen-month period started, *i.e.*, when "first payment would be required to be made under the [1989 DRO]." 26 U.S.C. § 414(p)(7)(E); *see also supra* note 15. I believe the answer to that question, however, is not relevant. *See* discussion *infra*.

**17.** A QDRO can only order a Plan to make *payments* in the present or future and not in the past. *See QDRO Handbook* at 19 (Q & A 2–11) (the eighteen-month period can only begin after its receipt by the plan). Thus, the eighteen-month suspension period in effect was reset and began on November 17, 1999, or the date the Plan received the 1999 Order. *See QDRO Handbook* at 20–21 (Q & A 2–13). (It should be noted that a putative alternate payee cannot prevent

from the 1989 decree, with a different payment commencement date. (The 1999 Order, granted on November 17, 1999, indicates that the benefits are payable to Margot, the alternate payee, immediately). Upon the 1999 Order taking effect as a QDRO, a determination the court made and the Plan is authorized to make independently and apparently did make, the "segregated amounts" should have become immediately payable to Margot. 26 U.S.C. § 414(p)(7)(B); 29 U.S.C. § 1056(d)(3)(H).

The 1999 Order would apply to the amount of benefits (and any appreciation thereof) existing in Alfred's Plan account on November 17, 1999, the date of the QDRO. If the Plan had made a distribution before November 17, 1999, for example, to a beneficiary such as Louan, the Order would not apply to such distributed amount. But the Plan did not make a distribution to Louan. Accordingly, the QDRO awarding *payment* to Margot takes effect *prospectively* from November 1999 as to the segregated benefits. In giving the QDRO prospective effect, I believe that the Plan is obligated to make payments required by the QDRO that had not already been paid out prior to the eighteen-month period of suspension of payment dating from November 17, 1999. Under the facts of this case, none of those funds have been paid out and, thus, all such funds are subject to the QDRO. *See Metropolitan Life Ins. Co. v. Wheaton,* 42 F.3d 1080, 1084 (7th Cir.1994) (explaining that the purpose of segregating funds is to protect ERISA plan administrators from paying the wrong party and being sued by a rival claimant).

## IX.

Thus, we should not conclude that the Plan is to pay out to Louan segregated funds

accumulated prior to November 17, 1999, as the majority holds. The controversy as to whether Louan should have been paid by the Plan prior to that date or at any point in time is not appropriately before us. The written plan itself does not appear to be in the record. Louan admits she has not filed a claim for payment. The record does not contain an instrument indicating that Louan is entitled to immediate payment of benefits. The Plan, as stated previously, is not a party to the suit, and thus, the Plan cannot be ordered to take any action. *Cf. Haiku Plantations Assoc. v. Lono,* 56 Haw. 96, 102, 529 P.2d 1, 5 (1974) ("In order for the decree of the lower court to be binding upon [ ] persons, they must be made parties to the suit, either as plaintiffs or defendants." (Internal quotation marks omitted.)). The Plan's funds were not interpleaded. *Cf. Aetna Life Ins. Co. v. Bayona,* 223 F.3d 1030, 1033 (9th Cir.2000) (holding that interpleader is an action to obtain appropriate "equitable relief," which may be brought by participant, beneficiary, or fiduciary to enforce provisions of ERISA or terms of ERISA plan); *Kapaia Store, Ltd. v. Henriques,* 33 Haw. 557, 557 (1935) (holding that non-parties must resort to interpleader in order to claim funds in hands of garnishee so that such claims may be adjudicated). The Plan has fiduciary duties with respect to any issues raised by Louan. *See Tinoco v. Marine Chartering Co., Inc.,* 311 F.3d 617, 2002 WL 31443145 (5th Cir.2002) ("Congress established extensive reporting, disclosure, and fiduciary duty requirements to insure against the possibility that the employee's expectation of the benefit would be defeated through poor management by the plan administrator." (Internal quotation marks omitted)).[18] Louan's appeal of

payment to a beneficiary by having a domestic relations order granted every eighteen months because once á negative QDRO determination is made, the plan administrator may distribute any payable amounts. *See* 26 U.S.C. § 414(p)(7)(C).)

**18.** According to the QDRO provisions of ERISA, [i]f a plan fiduciary acts in accordance with part 4 of this subtitle [relating to fiduciary duties] in—
 (i) treating a domestic relations order as being (or not being) a qualified domestic relations order, or

 (ii) taking action under [Section 414(p)(7) of the Code],
then the plan's obligation to the participant and each alternate payee shall be discharged to the extent of any payment made pursuant such Act [*sic* ].
29 U.S.C. § 1056(d)(3)(I). The fiduciary duty provisions in Part 4, which govern the actions of the Plan in its capacity of plan administrator, state, in pertinent part:
 [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and-

the Plan's decision is presently pending before the Plan.

Ordering the Plan in effect to pay out to Louan from segregated amounts already subject to the QDRO would, in light of the circumstances, establish questionable precedence. For, it is the purpose of a QDRO to alienate the rights of a participant and a beneficiary, such as Louan. *See* 29 U.S.C. § 1056(d)(3)(A); *Von Haden v. Supervised Estate of Von Haden,* 699 N.E.2d 301, 304 (Ind.App.1998) ("A QDRO allow[s] a plan participant to assign part of a pension plan in a divorce settlement."). Inasmuch as the 1999 Order has been determined to be a QDRO, its terms must be enforced. If there is a controversy with respect to Louan's claim, her dispute is with the Plan, not the QDRO, or with the ERISA law, not with the QDRO.

## X.

As to the remaining issues, it should be evident from the discussion of the QDRO provisions *supra,* that Louan, as a successor-in-interest, has no authority to exercise with respect to whether the 1999 Order is a QDRO or in connection with the execution of any QDRO. 26 U.S.C. § 414(p)(7)(A); 29 U.S.C. § 1056(d)(3)(H). Rather, the statute authorizes the plan administrator or a court of competent jurisdiction to make a QDRO determination, and only the Plan may "execute" or make payments according to the terms of a QDRO. *See id.* Thus, I would hold that that part of the court's order compelling Louan, as successor-in-interest, to execute the 1999 Order is inappropriate and must be reversed.

Also evident from the discussion above, we need not resolve the question of whether the court erred in finding that Louan did not receive a copy of the Plan's September 8, 1997 notice informing her that the divorce decree did not constitute a QDRO until June 1, 1998. The answer to that question is not pertinent to the validity of the 1999 Order, which is the only relevant order.

## APPENDIX A

The lack of published opinions of this court has been cited as a "problem" by the legal community. *See Report of the [Hawai'i] AJS Committee Reviewing Unpublished Opinions* at 4 [hereinafter, "the Report"] and discussion *infra.* Views regarding that issue have been largely relegated to unpublished opinions, which are generally unavailable. Accordingly, I have included the following discussion as part of my concurrence. *See* N.K. Shimamoto, *Justice is Blind, But Should She be Mute?,* 6 Hawai'i B.J. 6, 7 (2002) [hereinafter *Justice is Blind* ] ("The publication debate is currently a catch–22 for some judges and justices: if a judge or justice believes that an opinion should be published, and it is, there is no dispute over publication; if, however, a judge or justice believes that an opinion should be published, *and the majority votes not to publish,* then the judge or justice's work product (including why that particular case should be published) is simply relegated to a dissent or concurrence in an *unpublished* opinion." (Italicized emphases in original.)).

## I.

It is in the nature of stare decisis that, when this court in effect decides matters of first impression, we in fact establish precedent and, therefore, should publish our opinion. When we fail to publish, we depart from the established procedure which lends legitimacy to our decision-making process and also neglect our responsibility to provide guidance to courts, attorneys, and parties. The import of such an act is to make law for one case only, singling it out from all others, a process

---

(A) for the exclusive purpose of:
 (i) providing benefits to participants and their beneficiaries ...
(B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims[.]

29 U.S.C. § 1104(a)(1)(A) and (B). In the context of a QDRO, a plan administrator also shall discharge its duties in the interests of an alternate payee, who "shall be considered for purposes of any provision of [ERISA] a beneficiary under the plan." 29 U.S.C. § 1056(d)(4)(J).

that can only be described as arbitrary. When there are fundamental reasons for publishing and we are given the opportunity to do so but fail to, we also compel our trial courts and counsel to rely on and employ the precedent established in other jurisdictions when trying cases in our own state.

## II.

Unless we publish questions presented to us, they will continue to go unaddressed in any authoritative manner, and error may compound in other, similar cases leaving counsel and the trial courts to guess at the law to apply. Therefore, the fact that a majority of the court votes not to publish should not be determinative of the publication question. It is in the order of case law development that discourse on issues not covered in any existing published opinion should be disseminated and made available for examination, consideration, and citation by those similarly affected or interested. Only in the light of open debate can the dialectic process take place, subject to the critique of the parties, the bar, the other branches of government, legal scholars, and future courts. The resulting process of analysis and critique hones legal theory, concept, and rule.

Consequently, it should not matter whether such discourse is set forth in a majority, concurring, or dissenting opinion. Justice Ramil has suggested adoption of a rule like that of the First Circuit Court of Appeals that would require publication of a case (1) when the case is unanimously decided by a single opinion without a dissent, if, "[a]fter an exchange of views," any single justice votes for publication; or (2) with "a dissent or with more than one opinion[,] ... unless all participating judges decide against publication." *Doe v. Doe,* 99 Hawai'i 1, 15, 52 P.3d 255, 269 (2002) (Ramil, J., dissenting, joined by Acoba, J.) (quoting United States Court of Appeals of the First Cir. R. 36(b)(2)). *See,* N.K. Shimamoto, *Justice is Blind, supra* at 12 (Adoption of a " 'one justice publication' rule, unlike the 'majority rules' rule, faithfully abides by the premises upon which SDOs and memorandum opinions were based, promotes judicial accountability, and facilitates a judge or justice's role in the legal system—without sacrificing judicial economy."). Similar rules have been adopted in other jurisdictions.[1]

## III.

Justice Ramil and I have agreed and will continue to agree to any recommendation by any of the other justices to publish a case even if the majority will not adhere to such a policy. We do so because we support and respect the opinion of any one of our colleagues that a decision warrants publication and that the views raised in the opinion

---

1. *See, e.g.,* 6th Cir. R. 206 ("The following criteria shall be considered by panels in determining whether a decision will be designated for publication in the Federal Reporter: ... (4) whether it is accompanied by a concurring or dissenting opinion.... An opinion or order shall be designated for publication upon the request of any member of the panel."); 8th Cir., App. I, 28 U.S.C.A. ("The Court or a panel will determine which of its opinions are to be published, except that a judge may make any of his [or her] opinions available for publication."); 9th Cir. R. 36–2 ("A written, reasoned disposition shall be designated as an OPINION only if it: ... [i]s accompanied by a separate concurring or dissenting expression, and the author of such separate expression requests publication of the disposition of the Court and the separate expression." (Capitalization in original.)); Ala. R.App. P. 53 ("[I]f in a 'No Opinion' case a Justice or Judge writes a special opinion, either concurring with or dissenting from the action of the court, the reporter of decisions shall publish that special opinion, along with a statement indicating the action to which the special opinion is addressed."); Ariz. Sup.Ct. R. 111(b)(4) ("Dispositions of matters before the court requiring a written decision shall be by written opinion when a majority of the judges acting determine[s] that it involves a legal or factual issue of unique interest or substantial public importance, or if the disposition of matter is accompanied by a separate concurring or dissenting expression, and the author of such separate expression desires that it be published, then the decision shall be by opinion." (Internal section numbering omitted.)); N.D. Sup.Ct. Admin. R. 27, § 14(c) ("The opinion may be published only if *one* of the three judges participating in the decision determines that one of the standards set out in this rule is satisfied. The published opinion must include concurrences and dissents." (Emphasis added.)). For these, as well as other jurisdictions' rules, *see Doe,* 99 Hawai'i at 15 n. 6, 52 P.3d at 269 n. 6 (Ramil, J., dissenting, joined by Acoba, J.) (collecting similar rules in other jurisdictions).

should be disseminated. This is not an automatic and blind decision, but, instead, the recognition that every member of the judiciary, chosen to sit on the bench because of his or her expertise, has distinct and valuable viewpoints to offer in each case. Simply put, disagreement with a justice should not be a reason to limit the reach of that justice's comments. *See* N.K. Shimamoto, *Justice is Blind, supra*, at 7 ("A glance back through time reminds us that not only is this a country founded on the belief that we can voice our opinions against the majority, but that we have on numerous occasions embraced those opinions in the wisdom of a future day.")

## IV.

By contrast with the "one justice" rule suggested by Justice Ramil and which had once been the custom of this court,[2] the current "policy" in this court follows a "majority rules" approach, which the majority insists is the better course. The majority appears to assert that publication guidelines other than "majority rules" would result in our appellate process grinding to a halt. With all due respect, I submit that the majority's arguments against any one justice of

this court calling for the publication of a particular case miss the mark.

We favor the use of summary disposition orders for the vast majority of cases in which they are currently *appropriately* utilized. Numerous such orders have been filed which we have signed. We also do not propose that every case in which a dissenting or concurring opinion is filed necessarily requires publication. A number of summary disposition orders have been filed with a separate opinion.[3] We did not urge that these cases be published, as we do here.[4]

We believe that in some cases, however, a decision must be published. Guidance to litigants and the trial courts would be provided, where none exists. The analysis would be available by litigants for citation in pending or subsequent cases. The public and the legal community would be informed of the developing law in this area.

By ignoring, as it does, the views of other justices after a simple majority is obtained, the majority invites avoidable error. As we must all concede, error will occur under any system; the relevant inquiry is on which side error would weigh the least. I submit that there is more to be gained in a jurisprudential sense, and in the present legal milieu,

---

2. My understanding is that the majority rule regarding publication was recently adopted in 1996. As related by Justice Ramil, the custom of this court previously was to concur with a justice's recommendation to publish.

3. *See, e.g., State v. Irvine*, No. 24193, 98 Hawai'i 507, 51 P.3d 374 (Hawai'i Jul. 12, 2002) (unpublished) (Acoba, J., dissenting); *Saito v. Fuller*, No. 23913, 98 Hawai'i 507, 51 P.3d 374 (Hawai'i Jun. 8, 2002) (unpublished) (Ramil, J., concurring; Acoba, J., dissenting); *Ng. v. Miki*, No. 24267, 98 Hawai'i 278, 47 P.3d 745 (Hawai'i May 28, 2002) (unpublished) (Moon, C.J. and Nakayama, J., dissenting); *State v. Iha*, Nos. 23083, 23156, 23157, 23158, 23161, 23177, 23178, 23189, 23190, 23191, 23192, 23193, 23213, 23234, 23235, 23236, 23237, 23238, 23239, 23240, 23242, 23253, 23254, 23255, 23256, 23257, 23258, 23259, 23260, 23274, 23326, 23327, 23328, 23329, 23330, 23347, 23359, 23363, 23364, 23365, 23366, 23371, 23436, 23437, 23438, 23452, 23453, 23561, 23596, 96 Hawai'i 460, 32 P.3d 104 (Hawai'i

Aug. 27, 2001) (Nakayama, J., dissenting, joined by Ramil, J.).

4. The majority's refusal to address issues of first impression has little to do with numbers. *See, e.g., State v. Bush*, No. 24808, 2002 WL 31302086 (Oct. 11, 2002) (SDO) (Acoba, J., dissenting); *State v. Makalii*, No. 24833, 99 Hawai'i 431, 56 P.3d 733 (Oct. 2, 2002) (SDO) (Ramil, J., dissenting, joined by Acoba, J.); *State v. Lopes*, No. 24187, 99 Hawai'i 124, 53 P.3d 263 (Sept. 6, 2002) (SDO) (Acoba, J., concurring, joined by Ramil, J.); *State v. Hauanio*, No. 23034, 96 Hawai'i 461, 32 P.3d 105 (Aug. 30, 2001) (SDO) (Acoba, J., dissenting). The majority's approach will likely engender more such cases.

Moreover, as observed, from July 2000 through December 2000, "the Supreme Court wrote 106 opinions: 56 cases (52.8%) were disposed of via SDO, 20 cases (18.9%) by memorandum opinion, and 30 cases (28.3%) by published opinion." N.K. Shimamoto, *Justice is Blind, supra*, at 6. Thus, only 28.3% of Hawai'i Supreme Court cases were published during this time period.

from a policy which shares the decision to publish with each justice.

## V.

Long-term dangers lurk in the silencing of discourse and debate. It has been found that unpublished opinions too easily hide hidden agendas or a lack of reasoning behind an opinion. *See* M.H. Weresh, *The Unpublished, Non–Precedential Decision,* 3 J.App. Prac. & Process 175, 181 (2001) ("The foremost [criticism of unpublished decisions] appears to be the arguable effect the practice has on judicial accountability."). Moreover, a rule that grants a majority of justices the power to determine that a case will not be published serves to quash the alternative views expressed in a dissenting or concurring opinion. *See* M. Hannon, *A Closer Look at Unpublished Opinions,* 3 J.App. Prac. & Process 199, 221 (2001) ("[T]he existence of dissenting opinions in unpublished opinions cuts against the premise that unpublished opinions are used only in 'easy' cases.... [C]ases containing dissents and concurrences are, by definition, controversial[.]" (Internal quotation marks and citations omitted.)); S.L. Wasby, *Unpublished Decisions in the Federal Courts of Appeals: Making the Decision to Publish,* 3 J.App. Prac. & Process 325, 329 (2001) (discussing a 1989 report which reflected findings "that a significant portion of non-unanimous rulings [in the Eleventh Circuit] were not published, [and] that the ideology of judges ... played a role

in what got published" and which concluded that "publication of opinions in the Eleventh Circuit is much more subjective than the circuit courts would have us believe." (Internal quotation marks and citation omitted.)).

A majority's decision not to publish an opinion can be wielded as a punitive measure against those justices choosing to dissent, or who question the majority rule. *See, e.g., People v. Para,* No. CRA 15889, slip op. at 34 (Cal.Ct.App. Aug. 1979) (Jefferson, J., dissenting) (objecting to the majority's reversal of its earlier decision to publish a case after the dissenting opinion had been circulated). Such dangers are not hypothetical, but pose real threats to the integrity and efficacy of this court's institutional role in a democratic system.

## VI.

But nothing highlights the inefficacy of the "majority rules" approach to publication or undermines the majority's rationalization of its position more than the proposal submitted to this court to amend HRAP Rule 35 to permit (1) citation to unpublished opinions as persuasive authority and (2) petitions for publication of unpublished cases. On June 14, 2002, the Hawai'i Chapter of the AJS submitted the Report to the justices of the Hawai'i Supreme Court for our consideration. The proposal recommends that this court adopt an amendment to HRAP Rule 35,[5] because "[t]here is a *problem* perceived by the legal community with the continued use of summary disposition orders and, par-

---

**5.** / The AJS recommendation, *inter alia,* suggests an amendment to HRAP Rule 35. *See* The Report at 18, 20. The suggested amendment adds a new subsection c and re-alphabetizes and supplements the current subsection c as follows:

(c) *Application for Publication. Any party or other interested person may apply for good cause shown to the court for publication of an unpublished opinion.*

[(c)] (*d*) Citation. A memorandum opinion or unpublished dispositional order shall not be *considered nor shall* be cited in any other action or proceeding *as controlling authority,* except when the opinion or unpublished dispositional order establishes the law of the pending case, re [sic] judicata or collateral estoppel, or in a criminal action or proceeding involving the same respondent.

*In all other situations, a memorandum opinion or unpublished dispositional order may be cited in any other action or proceeding if the opinion or order has persuasive value.* A party who cites a memorandum opinion or unpublished dispositional order shall attach a copy of the opinion or order to the document in which it is cited, as an appendix, and shall indicate any subsequent disposition of the opinion or order by the appellate courts known after diligent search. If an unpublished decision is cited at oral argument, the citing party shall provide a copy to the court and the other parties. When citing an unpublished opinion or order, a party must indicate the opinion's unpublished status.

The Report at 22 (underscoring, indicating additions, and brackets, indicating deletions, in original).

ticularly, the inability to cite memorandum opinions despite the fact that these opinions appear to be of substantial length and content and often cite other case law as precedent for the conclusions." The Report at 4 (emphasis added). The consequences of *not* publishing have thus become a concern to the bench and the bar. A core function of this court is to interpret the law, to set forth our analysis, and to announce it for the education and guidance of the public. We abandon that function when we take a crabbed view of publication.

### VII.

The dissatisfaction with the number of unpublished opinions is also one reason why the State legislature was prompted to authorize two additional judges on the Intermediate Court of Appeals (ICA) level. The 1996 backlog is reflective of a fundamental lack of resources. In 2001, the legislature authorized two additional judges to be appointed to the ICA, in view of the appellate case load. *See* 2001 Haw. Sess. L. Act 248, § 1, at 646 (amending Hawai'i Revised Statutes (HRS) § 602–51 to indicate that the number of judges on the ICA would be increased by two). In considering whether such a measure was necessary, the legislature viewed the additional judges as one remedy for the burgeoning use of summary disposition orders, which apparently prompted some parties "to question whether [they were] getting due process[ ]":

> Attempts to deal with the appellate case load have evolved into procedures and processes that have been viewed as controversial, *causing some litigants to question whether the parties are getting due process. For example, a large number of cases were decided by summary disposition orders instead of opinion, and oral argument has become rare.* ... [I]f the State is to maintain an effective appellate justice system that disposes of cases in a timely manner and provides litigants with a fair hearing process, the number of ICA judges must be increased.

Stand. Comm. Rep. No. 1460, in 2001 House Journal, at 1495 (emphasis added). The leg-islators further indicated that such a measure would "improve the functioning and efficiency of the appellate judicial process." Conf. Comm. Rep. No. 166, in 2001 House Journal, at 1129.

However, as for funding for the two ICA judicial positions, the legislature reported that "[t]he Judiciary also testified that no appropriation is needed for the 2001–2002 fiscal year." Conf. Comm. Rep. No. 166, in 2001 House Journal at 1129. "[T]his bill will allow the Judiciary to begin the process of recruiting two new judges for the ICA. It is the intent of your Committee that no new additional funds be provided for this purpose for fiscal year 2001–2002." Stand. Comm. Rep. No. 976, in House Journal at 1495. The determination of whether these two ICA positions could have been funded under past or present judiciary budgets or at what point requests for legislative appropriations should be made is obviously subject to the exercise of the judiciary administration's discretion.

The reports also indicate that "[t]estimony of the Judiciary on this measure in this session indicated that expansion of the intermediate court is preparatory for later reorganization of the appellate system, which could be the subject of bills for the 2002 Session." Conf. Comm. Rep. No. 166, in 2001 Senate Journal at 944. A search of the 2002 legislative bills has not revealed any such reorganization plan.

What is stated is from the public record and we certainly do not intend to misrepresent the record. We are not privy to internal administrative decisions made by the judiciary administration. Obviously, we wholeheartedly agree with any and all efforts made to expand the current number of judges on the ICA.

### VIII.

Any implication that the adoption of a one-justice rule would have a far-reaching adverse impact in criminal cases, child custody and parental termination cases, and for business and property owners in civil cases, would be a decidedly exaggerated one. A one-justice rule would not result in a rash of publication requests or a significant delay. The "one justice" approach has been adopted

and implemented in many jurisdictions. Taking into account the expertise of all members of this court regarding the necessity of clarifying the law in any area makes the best use of our collective judicial wisdom.

It is evident that the number of cases on appeal, and the resulting hardship faced by litigants, may be in part due to the lack of clear legal precedent in an area of practice. Non-meritorious appeals are pursued by litigants when the law is murky, because the result is unpredictable. Thus, by not publishing and clarifying the law when such need is evident, we contribute to the uncertainty, and, thus, contribute to our backlog.

## IX.

The possibility of unintended consequences resulting from establishing precedent should not, in my view, alter publication when warranted. We cannot hide behind the fear that, in deciding a case, we may be creating precedent. That is the nature of our common law system. *See Anastasoff v. United States*, 223 F.3d 898, 904–05 (noting that the common law doctrine of precedent directed that all cases decided contributed to the common law, and, thus, retained precedential value, even if those cases were not "published" in official reporters), *vacated as moot on other grounds*, 235 F.3d 1054 (8th Cir.2000) (en banc). Common law is developed through the accumulation of cases, allowing application of rules of law to varying factual situations. A rule of law changes and is refined as time and the circumstances warrant, or may be abandoned altogether. If a case is fraught with contingent problems, it is our job to see to it that our decisions have the clarity and foresight to convey the effect intended, not to take refuge in the expedient cover of an unpublished decision.

Furthermore, as the court of last resort in this state, we are duty bound to decide hard issues presented to us and to render our best judgment in all cases. To allow a concern for unintended consequences to govern our decisions is to abandon our common law tradition altogether. To remain silent because we are afraid of what we might say under-mines our role as the highest state court and the reason that we are here.

## X.

### A.

The Judiciary's website, is not the answer, and the fallacy of arguing it is, is transparent. If the searcher knows the specific name and date of filing of the case, the case can be located among numerous dispositions, including orders, listed chronologically and grouped by year and month, by date of decision. *See* State of Hawai'i Judiciary, Hawai'i Appellate Court Opinions and Orders, *at* http://www.state.hi.us/jud/ctops.htm (last updated Aug. 14, 2002). However, researching is another matter, entirely. The research capabilities are extremely limited, if not practically non-existent. The Judiciary home page is a repository of our recent dispositions; it is not a research tool.

### B.

In any event, the reality is that, primarily, *only published opinions* are considered by lawyers and judges in researching the law with respect to a point of law or a specific issue. Only those dispositions that are accessible via the seventeen established case law search engines, such as found in the reporter system, are used by this state's Judiciary. The "publication by majority" rule then, for all practical purposes, suppresses dissenting and concurring theories from that body of law that would be consulted in any serious inquiry.

### C.

Additionally, because the current HRAP Rule 35 prohibits citation to unpublished opinions, when a majority of this court votes against publication of a case, the dissenting and concurring opinions in those cases cannot be cited as authority by attorneys who hope to urge a similar view or a reexamination of a majority position, or by attorneys and trial judges who consider the separate opinions helpful in deciding related issues. Ultimately, in those situations, the value of

dissenting and concurring opinions to practitioners and judges is nil.

## XI.

Limited resources and a backlog do not warrant summary disposition of cases that should be published. This concept was recently expressed by the Eighth Circuit Court of Appeals, which strongly objected to the over-use of non-published cases as a panacea for judicial backlog and emphasized our obligation to spend the time necessary to do a competent job on each case:

> It is often said among judges that the volume of appeals is so high that it is simply unrealistic to ascribe precedential value to every decision. We do not have time to do a decent enough job, the argument runs, when put in plain language, to justify treating every opinion as a precedent. If this is true, the judicial system is indeed in serious trouble, but the remedy is not to create an underground body of law good for one place and time only. The remedy, instead, is to create enough judgeships to handle the volume, *or, if that is not practical, for each judge to take enough time to do a competent job with each case.* If this means that backlogs will grow, the price must still be paid.

*Anastasoff,* 223 F.3d at 904 (emphasis added). Also, as one Court of Appeals judge has noted with regard to various plans in response to a growing backlog in the federal courts,

> [t]he frequently noted solution of reducing our caseload could reverse a series of salutary developments. The heavier caseload in large part reflects better access to the courts and more legal protections and benefits for less-favored members of society. I resist any wholesale surrender of these hard-fought victories to "reformers" rallying under the banner of judicial efficiency.

Patricia M. Wald, Symposium, *The Legacy of the New Deal: Problems and Possibilities in the Administrative State (Part 2) Bureaucracy and the Courts,* 92 Yale L.J. 1478, 1478 (1983).

## XII.

Cases which require focused review, especially those that deal with matters of first impression or which should be published on other grounds, are not susceptible to disposition according to limited time lines as may be determined by a majority. Not all cases present simple and previously decided questions of law. The critical examination and review necessary inevitably and inescapably requires time to accomplish. *See Anastasoff,* 223 F.3d at 904. Such examination and review spawn many instances where separate opinions and positions may result in major modifications and even reversals of original positions agreed to by a majority of this court. Insistence upon a contrary approach can only have a deleterious effect on the parties affected, the outcome of cases, and the development of case law.

Moreover, even the ultimate resolution of some apparently simple cases through summary disposition may take more time then initially estimated. Issues not initially raised or addressed by the majority may be pointed out by a dissent or concurrence. The "majority" may change several times as justices grapple with the law and facts posed within a case, and with other considerations and compromises. The decision of whether the case should be published or not may also change several times during the course of consideration. Accordingly, the end result of a lengthy dissent or concurrence by a justice attached to a summary disposition order may have had an earlier incarnation as a majority published decision. *See* N.K. Shimamoto, *Justice is Blind, supra,* at 7 n. 12 ("In the case of the Justice or Judge who pens the majority opinion but does not garner the votes for publication, the Judge or Justice may be forced to write a concurring [or dissenting] opinion to . . . express disagreement with the decision of the majority not to publish.")

Thus, a majority rule decision regarding publication does not necessarily mean that more time and resources are saved. That time and effort may already be invested. This is exemplified, as the AJS Hawaii Chapter points out, by the fact that unpublished opinions of this court have been "of substan-

tial length and content." The Report at 4. Also, denying "publication does not somehow deposit that time and energy back into the pool of resources so that it can be used on other cases." N.K. Shimamoto, *Justice is Blind, supra,* at 11.

More importantly, the expenditure of the court's resources in filling out the analysis of what was previously thought an "easy case" cannot be labeled a waste of resources, when a justice believes that justice is not being served by a superficial treatment of an appeal. Thus, we do not operate as a "committee," and our views, while opposed by the other justices, is certainly not intended to impugn their integrity. Case counts and statistics should not drive our disposition or deliberative process. In a conflict between the two, our primary duty lies in giving a case and the litigants involved the time they deserve. *See Anastasoff,* 223 F.3d at 904.

### XIII.

The rallying cry for those who raise the specter of backlogs as the justification for the expedient disposition of cases is "justice delayed is justice denied." As one judge has noted, speedy disposition is not to be equated with justice:

> To suggest that justice delayed is justice denied is not the answer. *Justice delayed is not always justice denied, and speedy justice is not always justice obtained.* Increased pressures on the judiciary resulting from increased litigation because of increased use of the courts by our society is an increased burden which must be met by the judiciary alone, without sacrificing the quality of the justice dispensed. The resulting pressures should and must be assumed by the judiciary without complaint.... *If justice delayed is justice denied, then justice without quality is also justice denied,* a result for which the judiciary alone will be held accountable without reference to collateral pressures from whatever source.

*Graver v. Secretary of Health, Ed. & Welfare,* 405 F.Supp. 631, 636–37 (E.D.Pa.1975) (emphases added).

I agree that cases should be decided as promptly as possible. But there is no justice in a rush to judgment that is mandated by internal policies and procedures embracing summary decisions. Too often the administration of formulaic approaches for expediting cases becomes the focus of the time and energy of the court, which should otherwise be spent on our fundamental function of deciding cases. I see no virtue in a race to rubber stamp a circulating draft of a decision so that it may be issued quickly by the court. Such approaches detract the public's attention from a prominent reason for such delays, that is, the lack of resources. *See supra* Section VII.

But other internal administrative obstacles cause inefficiencies that delay resolution of cases. Obstacles such as the lack of objective criteria as to whether an opinion should be published, *see State v. Tau'a,* 98 Hawai'i 426, 441 n. 1, 49 P.3d 1227, 1242 n. 1 (2002) (Acoba, J., dissenting, joined by Ramil, J.) (opinions which depart from existing law should be published); *Zanakis–Pico v. Cutter Dodge, Inc.,* 98 Hawai'i 309, 326, 47 P.3d 1222, 1239 (2002) (Acoba, J., concurring) (opinions which apply new rules of law should be published), and disputes concerning the publishability of an opinion, would be easily resolved by the rule adopted in some jurisdictions that the vote of one justice is sufficient to mandate publication. *See Doe,* 99 Hawai'i at 15 n. 6, 52 P.3d at 269 n. 6 (Ramil, J., dissenting, joined by Acoba, J.) But even the adoption of objective criteria and alternative measures such as proposed by the Hawai'i AJS will not cure the lack of published opinions, inasmuch as a majority disfavoring publication in the first place is unlikely to actually change its position even in the face of such objective standards or alternative measures. Hence, in our view, a single justice rule is necessary.

### XIV.

Moreover, although a case that should be published exacts deliberation and, thus, time to complete, over the long-term, publication has the effect of decreasing the backlog and saving ourselves, trial courts, and attorneys needless expense of time, effort, and resources. When we do not publish and ad-

dress the questions squarely presented to us, there are wide-ranging systemic effects.

Each party for whom the issue subsequently arises is faced anew with an error that is "novel," because we have not yet addressed it. Trial courts must guess at what law should be applied, further delaying the resolution of trials. Law clerks, judges, and justices must in effect "reinvent the wheel." *See John v. State*, 35 P.3d 53, 64 (Alaska Ct.App.1989) (Manheim, J., concurring) ("[S]o many of our decisions are unpublished that, given enough time and enough change of personnel, the court 'forgets' we issued those decisions."). Appellants and appellees must do the same. Thus, over the long-term, publication will reduce our backlog, by removing issues from our appellate treadmill.

Failing to publish decisions that should be published has a substantial impact on the public. When this court postpones for an indefinite time the resolution of issues presented before it, the result is to leave parties—whether they are prosecutors and defendants in criminal cases, parents and children in family court cases, business entities, government, or the public at large—and their attorneys to guess at what the law is in this jurisdiction, at the risk of guessing wrong. By the time the matter is brought again to this court, much time and events may have passed. It is no wonder that representatives of both the bench and the bar recommend the recourse of citing to the only body of law oftentimes available to them—unpublished opinions.

## XV.

In our view, the balance is to be struck in the context of our role as the court of last resort in this state and the long range perspective we must take. The litigants in each case deserve the considered judgment of each justice. Our obligation to the rule of law is to apply it assiduously, evenly, and justly; expediency should play no part in the task in which we are engaged. In that regard, more, not less, authoritative guidance strikes the right balance in our present legal milieu. By satisfying our obligation in individual cases, we fulfill our duty as stewards

of the judicial power, to all parties and to the public at large without favoring any one party or the interests of one litigant over another.